In re Karen P. CLEAVER–
BASCOMBE, Respondent.

A Member of the Bar of the District of
Columbia Court of Appeals (Bar
Registration No. 458922).

No. 06–BG–858.

District of Columbia Court of Appeals.

Argued Oct. 18, 2007.

Decided Jan. 14, 2010.

John O. Iweanoge, Jr., Washington, for respondent.

Joseph N. Bowman, Assistant Bar Counsel, with whom Wallace E. Shipp, Jr., Bar Counsel, and Judith Hetherton, Senior Assistant Bar Counsel, were on the brief, for the Office of Bar Counsel.

Before REID, Associate Judge, and NEWMAN and WAGNER, Senior Judges.

PER CURIAM:

The Board on Professional Responsibility (Board) has filed with this court a Supplemental Report and Recommendation that respondent, Karen P. Cleaver–Bascombe, be suspended from the practice of law for two (2) years with a requirement that she prove fitness before reinstatement for conduct violating four disciplinary rules, namely: Rule 1.5(a) (charging an unreasonable fee); Rule 3.3(a)(1) (making a false statement of material fact to a tribunal); Rule 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation); and Rule 8.4(d) (engaging in conduct that seriously interferes with the administration of justice). Cleaver–Bascombe excepts to the Board's supplemental report and recommendation, con-

tending that the record does not support the Board's findings or the recommended sanction. Alternatively, Cleaver–Bascombe requests that the court impose as a sanction a thirty-day suspension and suspend its execution for a period of six months with the requirement that she have a practice monitor and complete a Continuing Legal Education (CLE) course on record-keeping. We adopt the Board's findings in its supplemental report but reject its recommended sanction. We order that Karen P. Cleaver–Bascombe be disbarred.

## I.

### Factual and Procedural Background

This case returns to the court following remand proceedings pursuant to this court's opinion and remand order in *In re Karen P. Cleaver–Bascombe,* 892 A.2d 396 (D.C.2006) (*Cleaver–Bascombe I* ).[1] The case stems from findings that respondent, an attorney appointed to represent an indigent criminal defendant under the Criminal Justice Act (CJA), D.C.Code §§ 11–2601 *et seq.* (2001) in an extradition case, submitted a fraudulent voucher to the court seeking compensation for services that she knew she had not rendered. In *Cleaver–Bascombe I,* we considered the Board's initial report in which the Board adopted essentially the Hearing Committee's findings, concluded that respondent's

conduct violated four disciplinary rules (Rules 1.5(a), 3.3(a)(1) and 8.4(c), and 8.4(d)) and recommended that respondent be suspended from the practice of law for ninety days, with reinstatement conditioned upon her successful completion of a Continuing Legal Education (CLE) course on time and record-keeping, while Bar Counsel urged a one-year suspension with reinstatement conditioned upon proof of fitness to practice law. In making its original recommendation, the Board had declined to find that respondent's misconduct was aggravated by her testimony at the disciplinary hearing in which she supported the validity of the claimed services on the voucher. The Board "agree[d] with Respondent that the [Hearing] Committee's findings do not support a conclusion that [Respondent] presented false evidence or testimony." *Id.* at 399. In *Cleaver–Bascombe I,* the court identified a tension between the Board's findings in its initial report that required resolution by the Board before determining the appropriate sanction for the proven violations.[2] *Id.* at 399. Specifically, the court stated that "[b]ecause Respondent swore to essentially the same propositions in her voucher and in her testimony, ... the Board's finding that the voucher was intentionally false and patently fraudulent is difficult, if not impossible, to reconcile with its later treatment of Respondent's testimony as not

1. The factual background of this case is set forth in detail in *In re Cleaver–Bascombe I,* and we need not repeat it here except as necessary to an understanding of the disposition of the case. *See id.,* 892 A.2d at 398–401.

2. The court noted that the Board had essentially adopted the Hearing Committee's factual findings, including that:

Respondent included in her voucher, *inter alia,* claims for a meeting with her client at the District of Columbia Jail, and for several telephone conversations with him, even though she knew that this meeting and the

telephone conversations did not take place. The Board therefore concluded that Respondent submitted "a patently fraudulent voucher." *Cleaver–Bascombe I, supra,* 892 A.2d at 398.

The court further stated that even though respondent swore that the meeting and conversations took place, the Board agreed with respondent that she did not present false testimony and recommended a sanction more suited to remedy the conduct of a lawyer whose inaccurate vouchers arise out of poor record-keeping. *Id.* at 398–99.

having been proved to be deliberately false." *Id.* Therefore, the court remanded the case to the Board for revised findings and a new recommendation consistent with the court's opinion. *Id.* at 413.[3]

The Board explained in its supplemental report that it did not return the matter to the Hearing Committee on remand because the court did not direct it to do so, and neither Bar Counsel nor respondent requested it in their briefs on remand. Moreover, the Board expressed the view that even if the case were remanded to the Hearing Committee, it could not reasonably expect it to reconstruct accurately its credibility impressions after such an extended lapse of time. The Board stated that "[i]n these circumstances, the only course reasonably available to us is to review the Committee's findings anew with a view to identifying the conduct that we are confident at this juncture can be said to have been proved by clear and convincing evidence."[4] Following briefing by the parties on remand and upon further review, the Board issued its supplemental report in which it adhered to its prior finding that respondent submitted for payment a fraudulent voucher seeking compensation for services she knew that she had not rendered and made the additional finding that respondent exacerbated her misconduct in sworn testimony when she "defended her voucher as written and insisted that it fairly reflected the services she rendered." The Board concluded as a matter of law that respondent perjured herself in her testimony before the Hearing Committee. Therefore, the Board revised its recommended sanction to a suspension of two years with the requirement that respondent prove fitness before reinstatement.[5]

## II.

### A. Standard of Review

 When considering a Report and Recommendation from the Board on Professional Responsibility, this court must "accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record, and shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." D.C. Bar R. XI, § 9(h) (2006); *accord, In re Elgin,* 918 A.2d 362, 373 (D.C.2007); *In re Berryman,* 764 A.2d 760, 766 (D.C.2000). Similarly, "the Board is obliged to accept the hearing committee's factual findings if those findings are supported by substantial evidence in the record, viewed as a whole." *Elgin, supra,* 918 A.2d at 373 (quoting *Berryman, supra,* 764 A.2d at 766). "Generally speaking, if the Board's recommended sanction falls within a wide range of acceptable outcomes, it will be adopted and imposed." *In re Hallmark,* 831 A.2d 366, 371 (D.C. 2003) (other citations and quotations omitted).

 As we said in *In re Goffe:*

---

**3.** Judge Glickman dissented from the decision to remand and would have disbarred respondent for the misconduct and violation of the disciplinary rules. *Cleaver–Bascombe I, supra,* 892 A.2d at 413–15.

**4.** At oral argument, counsel for Cleaver–Bascombe affirmed that he did not request that the matter be returned to the Hearing Committee nor did he object to the Board, rather than the Hearing Committee, resolving the remanded issue.

**5.** Board member Mercurio filed a dissenting opinion which was joined by Board member Williams. They would impose a six-month suspension. Board member Helfrich dissented for the reasons stated by Judge Glickman in his opinion dissenting in part in *Cleaver–Bascombe I.*

Ultimately, however, the system of attorney discipline, including the imposition of sanctions, is the responsibility and duty of this court. *In re Hutchinson,* 534 A.2d [919,] 924 [ (D.C.1987) ]. "When the court disagrees with the Board as to the seriousness of the offense or the demands of consistency, however, the Board's recommendations are accordingly granted less weight." *In re Kennedy,* 542 A.2d 1225, 1228 (D.C.1988) (citing *In re Reback,* 513 A.2d 226, 230–31 (D.C.1986) (en banc)). More specifically, decisions of this court can serve as overall guidelines to assist in defining the permissible range of sanctions.

*In re Goffe,* 641 A.2d 458, 464 (D.C.1994).

We iterate briefly the applicable principles. To determine what discipline is appropriate under the circumstances, we review the respondent's violations in light of all the relevant factors. *Reback,* 513 A.2d at 231. These factors include (1) "the nature of the violation, [ (2) ] the mitigating and aggravating circumstances, [ (3) ] the need to protect the public, the courts, and the legal profession," *Hutchinson,* 534 A.2d at 924, and (4) the moral fitness of the attorney. *Id.* (citing *In re Smith,* 403 A.2d 296, 303 (D.C.1979)). The purpose of imposing discipline is to serve the public and professional interests identified and to deter future and similar conduct rather than to punish the attorney. *Kennedy,* 542 A.2d at 1231; *Hutchinson,* 534 A.2d at 924.

*Id.*

And as we said in *Cleaver–Bascombe I,* "where 'this court has had little occasion to pass upon conduct such as was involved in that case and here, and therefore our role in reviewing the Board's recommendation may be more assertive than in more familiar types of misconduct.'" *Cleaver–Bas-*

*combe, supra,* 892 A.2d at 402 (quoting *In re Schneider,* 553 A.2d 206, 211 (D.C.1989) (brackets and ellipses omitted in original)).

In the final analysis, we are always mindful that the solemn obligation and responsibility for determining and imposing disciplinary sanctions on a member of our bar rest upon this court. *In re Temple,* 629 A.2d 1203, 1207 (D.C.1993). *See also Cleaver–Bascombe I, supra,* 892 A.2d at 402; *Elgin, supra,* 918 A.2d at 376. With these standards in mind, we consider the Board's findings and recommendation and the arguments of the parties with respect thereto.

## B. The Board's Findings on Remand

■ Respondent argues that the record does not support the Board's conclusion that she submitted a patently fraudulent voucher. She contends that the Board's original finding that the voucher was prepared without much deliberation and that it was reckless, careless, and not cunning, negates any conclusion that respondent acted with a fraudulent intent. She argues that eleven of the twelve entries on the voucher are supported by the evidence and that one uncorroborated entry, *i.e.,* a jail visit, would not render the entire voucher patently fraudulent. However, in *Cleaver–Bascombe I,* this court rejected respondent's argument that the Hearing Committee's findings lacked adequate support in the record. *Cleaver–Bascombe I, supra,* 892 A.2d at 402. The Board found that all of the Committee's factual determinations are supported by substantial evidence and adopted them "*in toto,*" and this court did the same. *Id.* To the extent that respondent seeks to revisit the challenges previously raised and disposed of, we are foreclosed from doing so by the law-of-the-case doctrine. *Lenkin Co. Mgmt. v. District of Columbia Rental Hous. Comm'n,* 677 A.2d 46, 48 (D.C.1996) (citing *Kritsidi-*

*mas v. Sheskin,* 411 A.2d 370, 371 (D.C. 1980)); *see also M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971) ("[N]o division of this court will overrule a prior decision of this court ... and ... such [a] result can only be accomplished by this court en banc."). Thus, we consider here only those new or additional findings made in response to this court's remand order.

In the prior decision, the court affirmed the Board's findings and conclusions that respondent knowingly submitted a voucher for payment for services that she knew that she had not performed. Consistent with the Board's report, the court concluded that respondent's conduct violated four disciplinary rules: (1) Rule 1.5(a) (charging an unreasonable fee); (2) Rule 3.3(a)(1) (making a false statement of material fact to a tribunal, *i.e.,* Superior Court); (3) Rule 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, misrepresentation); and (4) 8.4(d) (engaging in conduct that seriously interferes with the administration of justice).[6] *Cleaver–Bascombe I, supra,* 892 A.2d at 403–04. The question that the court wanted clarified on remand before determining the appropriate sanction was the inconsistency between "the Board's conclusion that Respondent submitted a 'patently fraudulent voucher' with its position that the Hearing Committee's findings 'do not support the conclusion that

she presented false evidence or testimony....'"[7] *Id.* at 410–11.

In response to the court's remand order, the Board found that there was "clear and convincing evidence that respondent knowingly submitted a false voucher and exacerbated the misconduct with false testimony at the hearing." Citing as an "example" testimony concerning the jail visit, the Board went on to find that "Bar Counsel proved by clear and convincing evidence that Respondent knew when she testified to it that her story about the D.C. Jail visit was false." The Board pointed out that respondent defended her voucher, insisting that it fairly reflected the services she had provided. Although the Hearing Committee did not find her testimony credible, it did not find it to be deliberately false. The Board made that finding on remand. The Board then concluded, that respondent perjured herself.

Respondent argues that the record does not support the Board's supplemental finding that she testified falsely at the disciplinary hearing or perjured herself. She contends that although the Hearing Committee did not credit her testimony, it did not find that her testimony was deliberately false, but rather based its finding on other credible evidence. She contends further that she qualified her testimony, bas-

---

**6.** The court also disposed of respondent's legal contentions with respect to the Board's conclusion that she violated the four rules specified. *Cleaver–Bascombe I, supra,* 892 A.2d at 402–405.

**7.** The court also noted that in spite of its finding of respondent's dishonest conduct, the Hearing Committee took seriously the alternative possibility that respondent's violations resulted from negligence or recklessness, citing her inadequate record keeping. *Cleaver–Bascombe I, supra,* 892 A.2d at 409. In proposing a sanction, the Hearing Committee focused "less on Respondent's dishonesty and intent to deceive ... and more on ... the

need to remedy [her] 'shoddy' record-keeping...." *Id.* The court also pointed out that the Board took the position that the Hearing Committee *"did not find that Respondent was deliberately dishonest in her defense of this matter,* and the Board will not assume that she was when deciding the appropriate sanction for the underlying conduct." *Id.* at 410 (emphasis in the original). Significantly, the court also noted that "[t]o the extent that findings by the Hearing Committee or by the Board may be inconsistent with one another, ... there is substantial evidence in the record to support all of them, regardless of how any inconsistencies are resolved." *Id.* at 402 n. 5.

ing it upon her recollection and even identifying some mistakes in the bill. Bar Counsel argues that there is substantial record evidence to support the Board's finding that Bar Counsel proved by clear and convincing evidence that respondent knowingly submitted a false voucher to the Superior Court and that respondent deliberately gave false testimony before the Hearing Committee concerning it.

The Board acknowledges correctly, as respondent points out, that "[t]he Hearing Committee heard [Respondent] testify and found her testimony not to be credible, but it did not make a finding that her testimony was deliberately false." However, the Board reached that conclusion based on the facts that were established by the evidence. Specifically, the Board found that:

> While it is hard to imagine why Respondent would have made up the D.C. Jail visit out of whole cloth when she originally prepared her voucher—as we have noted she did have encounters with her client to which she could have properly attributed time—we find that when she stuck with her story during the disciplinary proceedings, she did so knowing it was false. . . . And even though the Hearing Committee listened to her testimony and did not find it to be knowingly false, we find that the Committee erred

in this respect. We find that Bar Counsel proved by clear and convincing evidence that Respondent knew when she testified to it that her story about the D.C. Jail visit was false.

In reaching the foregoing conclusions, the Board accepted the Hearing Committee's factual findings that were supported by substantial evidence. *See Elgin, supra,* 918 A.2d at 373 (citations omitted) (setting forth the standard that the Board must accept the Hearing Committee's factual findings if supported by substantial evidence). Those findings included that there was clear and convincing evidence that respondent did not meet with her client at the D.C. Jail on the date that she indicated on her voucher. While the Hearing Committee reached its determination by crediting certain evidence and discrediting other evidence, as respondent contends,[8] this factor does not undermine the Board's conclusion based on that evidence that Respondent knew when she testified in detail about the meeting that it had not occurred. As to the claimed meeting at the jail, the Board could properly conclude that "it is hard to imagine that Respondent forgot that she did not go [to the jail]" and that she could not be reasonably mistaken in testifying otherwise.[9] The Board's factual

---

**8.** As to the jail visit, the Hearing Committee found that respondent did not have a meeting with her client at the jail. In doing so, the Hearing Committee found the testimony of respondent's client to be credible on this issue and that he had no bias against her, even though it determined that he had provided inaccurate information on certain other matters. The Committee declined to rely on the testimony of the correctional officer that respondent offered as a corroborating witness because his memory regarding the incident was inaccurate, and his demeanor while testifying was evasive, nonresponsive, and his testimony was flatly contradicted by documentary evidence. Respondent did not present another witness (her investigator who she testified accompanied her on this jail visit)

with knowledge of the events. Therefore, the Hearing Committee concluded that respondent presented no credible evidence that she met with her client at the D.C. Jail on the date that she indicated on her voucher and concluded that Bar Counsel presented clear and convincing evidence that she did not meet with him.

**9.** There are aspects of respondent's testimony, which she cites in her brief, which show that she testified that she met with her client at the jail "to the best of her recollection" and that she reconstructed her voucher from cross-references to "scribble" in her diary and her case jacket and that she did not always remember exactly what she did. However,

finding in this regard is supported by substantial evidence of record; therefore, we adopt it. *See* D.C. Bar R. XI, § 9(h); *Elgin, supra,* 918 A.2d at 373.

The Board went further to conclude that respondent perjured herself, citing as an example her testimony concerning the jail visit. Respondent argues that the record does not support the conclusion that she perjured herself. She contends that such a finding should not be made absent a finding of the requisite specific intention, which the Hearing Committee did not make. Whether the Board could properly find all elements of perjury in the legal sense based on the Hearing Committee's factual findings or on the record has no significant impact on the sanction here, given the facts that have been established.[10] It is sufficient for purposes of the disposition of this case that the Board found that respondent's testimony concerning her jail visit was knowingly false, a finding fully supported by clear and convincing evidence.

Indeed, as we said in *Cleaver–Bascombe I:*

> [I]f Respondent did not in fact come to the jail on that occasion, and if the claim in her voucher that she did visit was a deliberate falsehood, then she necessarily also lied under oath at the hearing; it

is hard to imagine that Respondent forgot that she did not go.

*Cleaver–Bascombe I, supra,* 892 A.2d at 410. We need not, and do not decide, whether the Board's further legal conclusion that respondent is guilty of perjury in any legal sense of the term is supported.

### C. Sanctions

 Mindful of the legal principles we have outlined in Section II.(A) (Standard of Review), we reject the Board's recommended sanction of a two-year suspension with a fitness requirement. We likewise reject respondent's contention that a three-month suspension coupled with a requirement that she complete a CLE course in record-keeping is the appropriate sanction.

What we said in *Cleaver–Bascombe I* bears repeating here:

> The allegations in this case are extremely serious. The compensation of attorneys who represent criminal defendants in the District of Columbia courts pursuant to the Criminal Justice Act is based upon the assumption that members of our Bar are honorable men and women who will accurately report the work that they have done, and who will not demean their noble calling and bring disgrace to themselves and to their pro-

---

these qualifications do not explain away the Hearing Committee's finding that the meeting did not occur nor the Board's finding that in testifying otherwise in such detail, respondent had to have known that the testimony was not accurate.

10. Perjury in the criminal context requires proof: "1. [t]hat the [person testified under oath or affirmation]; 2.[t]hat the oath or affirmation was taken before a competent [tribunal][officer] [person]; 3.[t]hat the oath or affirmation was taken in a case in which the law authorized that oath or affirmation; 4.[t]hat in his/her testimony the defendant made the statements detailed in the indictment; 5.[t]hat the statements were material;

6. [that the statements were false]; and 7.[t]hat the defendant knew or believed that the statements were false when s/he made them." CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.87 (5th ed.2007). A criminal defendant cannot be convicted of this charge upon the sworn testimony of only one person, although the two witness burden can be satisfied by the testimony of one sworn witness and corroborating documentary evidence. *Id.; Hsu v. United States,* 392 A.2d 972, 980–81 (D.C.1978) (stating the rule that "one witness plus independent corroborative evidence will also suffice" for proof of perjury).

fession by swearing that they performed work that they did not do. Attorneys who accept CJA appointments are therefore expected to be scrupulously honest and to exercise a high degree of care in completing their vouchers, which are paid out of taxpayer funds, and which are submitted to the court under penalty of perjury. Where an attorney has deliberately falsified a voucher and sought compensation for work that he or she has not performed, or for time that he or she has not devoted to the case, that attorney's fitness to practice is called into serious question. This is especially true if the attorney has compounded his or her initial fraud by testifying falsely during the resulting disciplinary proceedings.

*Id.* at 398.

The first factor our cases call for us to consider is "the nature of the violation." *Goffe, supra,* 641 A.2d at 464. Cleaver–Bascombe submitted a "patently fraudulent" voucher seeking compensation from public funds for work she had not performed. We see no meaningful distinction between such fraudulent conduct and other fraudulent conduct leading to disbarment. *Cleaver–Bascombe I,* 892 A.2d at 414 (Glickman, J., dissenting in part) (describing behavior for which "disbarment is virtually automatic, including misappropriation of client funds, *In re Addams,* 579 A.2d 190, 191 (D.C.1990) (en banc); mail or wire fraud, *In re Bond,* 519 A.2d 165, 166 (D.C.1986); felony theft of federal funds, *In re Patterson,* 833 A.2d 493 (D.C.2003), and other felony theft offenses, *see id.* (citing cases)."). We see no basis for distinguishing for the purpose of disciplinary sanction between stealing clients' funds and stealing public funds. The fundamental element of basic dishonesty is the same. Both reflect the lack of moral rectitude needed to be a member of the legal profession. As we said in *In re Minninberg,*

"[m]isappropriation by an attorney of a client's (or other) funds is a most serious offense." 485 A.2d 149, 151 (D.C.1984).

Where we have concluded that the attorney's conduct falls into a category of dishonesty of a flagrant kind we have held disbarment to be the appropriate sanction. *See, e.g., Berryman, supra,* 764 A.2d at 761 (paying self attorney fees from a probate estate without prior court authorization); *In re Utley,* 698 A.2d 446, 447 (D.C.1997) (paying attorney fees from conservatorship funds without prior court approval and delay in repayment); *In re Gil,* 656 A.2d 303, 304 (D.C.1995) (misappropriation by creating false documents); and *In re Goffe, supra,* 641 A.2d at 461 (submitting false statements and manufactured documents to IRS and lying to the Tax Court). To be sure, Cleaver–Bascombe did not succeed in her attempt to fraudulently obtain public funds. That failure was through no fault of her own. Rather, it resulted solely from the extraordinary diligence of now deceased Judge Steffen W. Graae, who was the Superior Court judge responsible for approving the voucher in question. Judge Graae ultimately disapproved the voucher *in toto* and referred the matter to Bar Counsel.

Another of the factors we must consider is "the need to protect the public, the courts and the legal profession." *In re Goffe, supra,* 641 A.2d at 464 (quoting *Hutchinson, supra,* 534 A.2d at 924). We can say it no better than Judge Glickman did in his partial dissent in *Cleaver–Bascombe I:*

> Importantly, too, for this case, we keep in mind that one purpose of discipline is "to deter other attorneys from engaging in similar misconduct." *In re Reback,* 513 A.2d 226, 231 (D.C.1986) (en banc).... In the interest of effective general deterrence, the severity of a

sanction should take into account the difficulty of detecting and proving the misconduct at issue. That principle argues strongly in favor of disbarring Respondent, because inflated vouchers are difficult to detect and prove. To deter unscrupulous attorneys who know they are not likely to be caught if they inflate their charges, voucher fraud must incur a heavy penalty.

*Cleaver–Bascombe I, supra,* 892 A.2d at 414.

Yet another factor we consider is the existence of mitigating or aggravating circumstances. In mitigation are the absence of prior discipline and "lack of harm to the client." [11] These mitigating factors are massively outweighed by the aggravating factor-testifying falsely under oath in the disciplinary proceeding that the voucher was indeed accurate.

> Lawyers have a greater duty than ordinary citizens to be scrupulously honest *at all times,* for honesty is "basic" to the practice of law.... Every lawyer has a duty to foster respect for the law, and *any* act by a lawyer which shows disrespect for the law tarnishes the entire profession.

*In re Mason,* 736 A.2d 1019, 1024–25 (D.C. 1999) (quoting *Hutchinson, supra,* 534 A.2d at 924).

In addition to her own testimony, Cleaver–Bascombe presented the testimony of another witness to support her claimed "jail visit." The Hearing Committee discredited this witness' testimony based on written records and other evidence which contradicted his claim of being present at the jail during the visit.[12]

Here we have a fraudulent attempt to obtain public funds by submitting a sworn CJA voucher, under pains and penalties of perjury, which was false and fraudulent compounded by Cleaver–Bascombe presenting false testimony in support of the fraudulent voucher. As the Board said in its Report: "The attempted cover-up often exceeds the initial misconduct. It did so here." And as we said in *Cleaver–Bascombe I,* "lying under oath on the part of an attorney for the purpose of attempting to cover-up previous ... [misconduct] ... is absolutely intolerable...." *Cleaver–Bascombe I, supra,* 892 A.2d at 412. In sum, Cleaver–Bascombe submitted a "patently fraudulent" voucher while under oath. She then lied, also under oath, about submitting the voucher. She maintains now, as she has throughout the proceedings beginning with Judge Graae in the Superior Court, throughout the disciplinary proceeding in *Cleaver–Bascombe I* and here, in *Cleaver–Bascombe II* that her voucher is accurate and her testimony was truthful.

The purpose of imposing discipline is to serve the public and professional interest and to deter future and similar conduct. *Hutchinson,* 534 A.2d at 924. We conclude that this record demonstrates that Cleaver–Bascombe lacks the moral fitness

---

**11.** Although there was no injury to Cleaver–Bascombe's client, there was serious injury to the judicial system and the administration of justice.

**12.** Given the fact that, in our opinion in *Cleaver–Bascombe I,* we concentrated on the question of the claimed jail visit, it is not surprising that the Board concentrated on this as an "example" of deliberate false testimony by Cleaver–Bascombe. However, this is not the only instance where the Board deemed her testimony to be false. For example, the Board adopted the Hearing Committee's determination that the testimony of Cleaver–Bascombe concerning the number of times she met with her client and the amount of time spent thusly was not credible as part of the evidentiary basis for its conclusion that the voucher was "patently fraudulent." *See Cleaver–Bascombe I, supra,* 892 A.2d at 398.

to remain a member of the legal profession.[13] It is

ORDERED that Karen P. Cleaver–Bascombe is disbarred from the practice of law in the District of Columbia, effective thirty days from the date of this opinion. *See* D.C. Bar R. XI, § 14(f). For the purpose of seeking reinstatement to the Bar, the period of disbarment shall not be deemed to begin until Cleaver–Bascombe files a sufficient affidavit pursuant to D.C. Bar R. XI, § 14(g).

*So ordered.*

WAGNER, Senior Judge, dissenting:

"Under this court's precedents, ... a presumption of disbarment rebuttable only by 'compelling extenuating circumstances' has heretofore been reserved for one class of intentionally dishonest conduct, that involving misappropriation of client funds." *In re Pennington*, 921 A.2d 135, 141 (D.C. 2007) (citing *In re Addams*, 579 A.2d 190 (D.C.1990) (en banc)).[1] In *Addams*, this court found warranted this essentially *per se* rule[2] because such a breach "betray[s] [the lawyer's] highest trust" and "is so reprehensible, striking at the core of the attorney-client relationship, that the respondent must carry a very heavy burden

in rebuttal." *Id.* at 194, 198–99. Today, contrary to the recommendation of the Board on Professional Responsibility (Board), the panel majority adds to the cases warranting presumptive disbarment a new category of cases for which sanctions have been determined previously by application of well-established principles for imposing sanctions that address each case on its own terms. *See, e.g., In re Elgin*, 918 A.2d 362, 376–84 (D.C.2007) (outlining the guidelines for the determination of sanction in bar disciplinary cases and applying them); *In re Cater*, 887 A.2d 1, 17 (D.C.2005) (same). "Sound reasons no doubt can be offered for making all forms of intentional dishonesty presumptively sanctionable by disbarment, ... [b]ut the state of disciplinary law in this jurisdiction does not reach that far...." *Pennington*, 921 A.2d at 142 (citations omitted). While a *per se* rule may be easier to apply, it ultimately leads to inequitable results. *See Berryman, supra* note 2, 764 A.2d at 765 (noting that except for the *Addams* rule, which is too inflexible, disbarment would not be warranted in the *Berryman* case where a lengthy suspension would have met fully the objectives of the disciplinary system); *In re Pierson*, 690 A.2d 941, 951 (Judges Schwelb and

---

13. Our dissenting colleague says "the panel majority adds to the cases warranting presumptive disbarment a new category of cases...." *infra* p. 1201. On the contrary, our holding is fact-specific to this case and does not involve presumptive discipline.

 Cleaver–Bascombe submitted a "patently fraudulent" voucher while under oath. She then lied, also under oath, about submitting the voucher. She maintains now, as she has throughout the proceedings beginning with Judge Graae in the Superior Court, throughout the disciplinary proceeding in *Cleaver–Bascombe I* and here, in *Cleaver–Bascombe II* that her voucher is accurate and her testimony was truthful.

 ... We conclude that this record demonstrates that Cleaver–Bascombe lacks the

moral fitness to remain a member of the legal profession.
*Supra* pp. 1200–01.
 We hold no more; no less.

1. In *Addams*, this court held that "[w]hen a member of the bar is found to have betrayed his high trust by embezzling funds entrusted to him, disbarment should ordinarily follow as a matter of course." *Addams*, 579 A.2d at 193.

2. *See In re Berryman*, 764 A.2d 760, 768 (D.C. 2000) (citation omitted) (recognizing that "[o]ur misappropriation rule 'does not require scienter; rather, it is essentially a per se offense' ") (citation omitted).

Ruiz concurring because of the *Addams* rule, but noting the inflexibility of the rule and apparent inequities in results as compared to other cases); *see also Addams,* 579 A.2d at 203 (Judge Ferren concurring and noting that the Board and the Court apparently recognize that a *per se* disbarment rule would be "inequitable and unworkable," and questioning the adoption of a presumption so strong that it effectively eliminates the discretion of the Board and the Court necessary to deal fairly with the facts of each case). This difficult case is particularly ill-suited for the adoption of this new category of cases for presumptive disbarment treatment for at least three significant reasons, specifically: (1) the ultimate disbarment sanction is wholly inconsistent with sanctions imposed for similar cases involving attorney dishonesty and lying under oath; (2) the majority's analogy to misappropriation cases is imperfect; and (3) the Board's recommended sanction of a two-year suspension with the requirement of proof of fitness before reinstatement, based on established guidelines, falls within the range of acceptable outcomes and affords protection to the public, the courts and the profession. Therefore, I would adopt the Board's recommendation, which is supported by Bar Counsel, and must respectfully dissent from the decision of my colleagues.[3]

## A. Inconsistency of Disbarment with Cases Involving Similar or More Egregious Misconduct

"The imposition of sanctions in bar discipline, as with criminal punishment, is not an exact science but may depend on the facts and circumstances of each particular proceeding." *In re Goffe,* 641 A.2d 458, 463 (D.C.1994) (citing *In re Haupt,* 422 A.2d 768, 771 (D.C.1980)). Generally speaking, the magnitude of the transgression will bear some relationship to the severity of the disciplinary sanction imposed by the court. *See Pennington, supra,* 921 A.2d at 143 (rejecting the Board's recommended disbarment sanction as "disproportionate to the gravity of [the] misconduct"); *Goffe,* 641 A.2d at 464 (recognizing that the outer limits of sanctions will increase when dishonesty of greater magnitude is presented to the court). We operate under rules that require us to seek to achieve consistent disciplinary sanctions for comparable misconduct. *See* D.C. Bar Rule XI, § 9(g)(1) (requiring the court to adopt the Board's recommended sanction "unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted"). To impose differing sanctions for comparable misconduct would "bring about [an] asymmetry that [Rule XI, § 9(g)(1) ] was intended to avoid." *In re Reback,* 513 A.2d 226, 230 (D.C.1986) (en banc) (discussing former Rule XI, § 7(3) to the same effect). The decisions of this court "serve as overall guidelines to assist in defining the permissible range of sanctions." *Goffe,* 641 A.2d at 464. We adhere to this precept even if we are addressing cases that present new factual variations or cases where the court's view of the seriousness of the charges differs from that of the Board. *See Reback,* 513 A.2d at 230–31. While the prior panel of this court viewed this case as one for which "there are no other cases of fully comparable conduct with which we must maintain consistency,"[4] there are cases

---

**3.** If the panel majority's opinion represents only a fact-specific holding (see footnote 13, *supra* ), then the sanction it imposes is extremely inconsistent with comparable cases, as discussed *infra.*

**4.** *See In re Cleaver–Bascombe,* 892 A.2d 396, 402 (D.C.2006) (*Cleaver–Bascombe I* ). However, the court remanded the case to the Board, and therefore, did not decide the question of sanction.

sufficiently analogous to review in an effort to maintain some consistency and to enforce a general sense of equality in the sanction imposed. These include cases involving attorney dishonesty, false representations to a court or other tribunal, and/or lying under oath, including testimony in a disciplinary proceeding. A brief review of some of those cases involving similar misconduct will demonstrate that the imposition of the ultimate sanction of disbarment in this case exceeds the range of sanction for cases involving similar or more egregious misconduct, as the Board apparently concluded.

A useful starting place is the Board's review of the range of sanctions imposed by this court for cases involving dishonesty and misrepresentation. *See In re Jackson*, 650 A.2d 675, 678–79 (D.C.1994) (appendix). The sanctions imposed in the cases that the Board identified for the

Court in *Jackson* (recounted here in the margin) ranged from public censure to a suspension for a year.[5] In *Goffe, supra*, this court made clear that the absence of prior cases imposing a greater suspension than one year for attorney dishonesty did not mean that term to be a ceiling: "[r]ather, it simply evidences that no such example of attorney dishonesty of the magnitude of that demonstrated here has previously been presented to this court." 641 A.2d at 464. In *Goffe*, this court disbarred the attorney where his "egregious" misconduct involved "not only a pattern of dishonesty and lying but blatant fabrication and creation of evidence." *Id.* at 460. Goffe "manufactured evidence for use before the IRS, lied under oath to the Tax Court, and continued to lie about his actions to the Hearing Committee." *Id.* at 465. He forged signatures and falsely notarized documents to gain an economic

---

5. The Board reported:

Public censure was ordered for false statements on a resume. *In re Hadzi–Antich*, 497 A.2d 1062 (D.C.1985). A thirty-day suspension was ordered for making three separate misrepresentations to a court; *In re Rosen*, 481 A.2d 451 (D.C.1984), and for falsification of travel expenses by a law firm associate, *In re Schneider*, 553 A.2d 206 (D.C.1989) (Newman, J., dissenting, would have censured the lawyer). A sixty-day suspension was ordered for misrepresentation to a court to avoid disqualification for conflict of interest. *In re Waller*, 573 A.2d 780 (D.C.1990). A ninety-day suspension was ordered for lying about salary on an application for a bank loan, *In re Kennedy*, 542 A.2d 1225 (D.C.1998); for false interrogatory answer and lying at a deposition by an attorney acting pro se, *In re Thomas*, No. M–94–81 (D.C. March 1, 1982) (unpublished); and for helping a divorce client hide assets via a false interrogatory answer, *In re Sandground*, 542 A.2d 1242 (D.C. 1988). A six-month suspension was ordered for forging a client's signature on a complaint and then having it notarized, *In re Reback*, 513 A.2d 226 (D.C.1986) (Newman, J., dissenting, would have imposed a

suspension of one year and a day and a fitness requirement), and for making false statements to a bank on behalf of a client and lying under oath regarding the conduct, *In re Greenspan*, 578 A.2d 1156 (D.C. 1990) (fitness requirement also imposed due to "significant record of prior discipline"). A one-year suspension was imposed for false, sworn testimony to the government regarding an attorney's role in a stock purchase, *In re Hutchinson*, 534 A.2d 919 (D.C.1987); for assisting a client to make false statements on an immigration application, *In re Thompson*, 538 A.2d 247 (D.C.1987); and for making illegal campaign contributions, *In re Wild*, 361 A.2d 182 (D.C.1976) (respondent also convicted of misdemeanor violation based on same conduct).

*Jackson, supra*, 650 A.2d at 678–79 (appendix). In *Jackson*, respondent was found to have violated DR 1–102(A)(4) (dishonesty and misrepresentation) by filing two tax returns with the IRS claiming substantial deductions for which there was no documentation. *Id.* at 677. Finding the case roughly equivalent to those where six months was imposed, the Board recommended, and the court imposed, a six-month suspension. *Id.*

benefit. *Id.* In rejecting the Board's recommendation of a one-year suspension with a requirement of proof of fitness in favor of disbarment, the Court explained that what distinguished the case most from those preceding it is "the repeated resort not only to false testimony but to the actual manufacture and use of false documentary evidence in official matters." *Id.* at 464. Cleaver–Bascombe's case is in marked contrast to *Goffe.* Respondent's single episode of misconduct, although undeniably serious, dishonest, and aggravated by her subsequent failure to acknowledge it, must necessarily be viewed, as the Board apparently does, as less egregious than Goffe's, thereby warranting a lesser sanction.

Other cases should be examined in order to assess fairly respondent's case against those for which lesser sanctions than disbarment have been found by this court to be warranted. This court imposed a six-month suspension with a restitution requirement in a case where the attorney used his client's credit card for his own personal expenses without her authorization, damaged the client's credit rating by failing to pay for the charges, made an undisclosed settlement for the account with the bank, and failed to abide by the settlement terms.[6] *Elgin, supra,* 918 A.2d at 366–72. In spite of the fact that the attorney essentially used his client's (money) credit card for his own personal use without her authorization for such expenditures, committed various other violations in the course of his representation, and

made an insufficient showing of remorse by failing to repay the client $5000 he admittedly owed her, this court gave consideration to his lack of a prior disciplinary record and personal family circumstances and imposed only the brief six-month suspension with a restitution requirement. *Id.* at 383–84. Misuse of a client's money falls within a category which is typically subject to more severe sanctions. *Addams, supra,* 579 A.2d at 198 ("Simply put, where client funds are involved, a more stringent rule is appropriate."). One can reasonably question why the first offender attorney in *Elgin,* who essentially took his client's money without right and without remorse, was viewed to warrant a sanction of only six months and restitution, while the first offender attorney in this case is viewed as warranting the ultimate sanction of disbarment.

Among cases cited in footnote 5 covering cases involving dishonesty and false representations, two others should be examined further for comparison with the sanction being imposed upon respondent here. In *Schneider,* the attorney was disciplined for violating DR 1–102(A)(4) (dishonesty, fraud, deceit, or misrepresentation) for knowingly submitting false travel reports on eight separate occasions to his law firm and deliberately falsifying the amounts on his credit card receipts by altering them to increase the amount shown. *Schneider, supra* note 5, 553 A.2d at 209, 211. The alterations did in fact deceive the firm and potentially the client who would ultimately

---

**6.** In the course of his misconduct, respondent violated the following disciplinary rules: Rule 1.5(b) (by failing to explain adequately the basis for his legal fees); 1.7(b)(4) (by representing a client where his "professional judgment on behalf of the client will be or reasonably may be adversely affected by ... the lawyer's own financial business, ... or personal interests"); Rule 1.2(a) (requiring the lawyer to abide by client's decision to accept

a settlement); Rule 1.3(b) (requiring that the lawyer not intentionally prejudice or damage the client's case); Rule 1.4(a) (requiring that the lawyer keep client reasonably informed about a matter); Rule 1.8(a) (prohibiting an attorney from acquiring a pecuniary interest adverse to his client); Rule 8.4(d) (by filing an answer and settling the lawsuit without proper disclosure to the client). *Elgin, supra,* 918 A.2d at 374–75.

have to pay. *Id.* at 209. This court imposed only a thirty-day suspension for Schneider, citing as mitigating factors the attorney's remorse, cooperation with Bar Counsel, his newness to the Bar, and his clean record since. *Id.* at 212. Some consideration was given to Schneider's claim that he was only engaged in a short-cut method of obtaining reimbursement to which he thought himself entitled. *Id.* at 211. While respondent in this case does not have the same mitigating factors, she has some of them. Like Schneider, she has no prior disciplinary record, and no post-disciplinary violation has been reported. According to the Hearing Committee and the Board, respondent had rendered services for which she could have recovered the compensation without any misrepresentation on her voucher. Any differential warranted because respondent has fewer mitigating factors and more aggravating factors can be reflected in the length of the suspension and fitness requirement recommended by the Board and Bar Counsel. The question is whether respondent's misconduct warrants the wide disparity between the sanction she will receive and that imposed in the *Schneider* case. I think not.

Further review should also be made of this court's decision in *Sandground,* where this court imposed a ninety-day suspension for an attorney who violated DR 1–102(A)(4), (5), and (7) [7] where the attorney assisted the client in concealing information about his funds in connection with discovery requests in a divorce action. *Sandground, supra* note 5, 542 A.2d at 1243. Significantly, this court noted that "Sandground's knowing participation went to the heart of the controversy between [his client] and his wife and threatened to

defraud [the wife]." *Id.* at 1248. His misconduct involved dishonesty in a judicial proceeding and "threatened to advance the pecuniary interests of a personal friend at the expense of his friend's wife." *Id.* at 1249. Originally, Sandground also gave false information to Bar Counsel about the transaction. *Id.* at 1245. The question is again whether respondent's attempt to recover for her services by falsifying her CJA voucher is so different and so much more egregious than the violation in *Sandground* that it deserves the extreme sanction of disbarment, while this court imposed only a ninety-day suspension on Sandground. I think that the only fair answer is no.

There is one case involving a violation of one of the comparable disciplinary rules coupled with lying before the hearing committee which is instructive. The attorney, who was disciplined for conduct involving dishonesty, fraud, deceit or misrepresentation, like respondent here, also gave false testimony before the Hearing Committee. *Thompson, supra* note 5, 538 A.2d at 248. In *Thompson,* the attorney's discipline arose out of his "knowingly assisting in the presentation of false statements to the Immigration and Naturalization Service (INS) in support of the application of his client for status as a permanent resident alien." *Id.* at 247. The attorney had a record of prior discipline, unlike respondent in this case, yet he was suspended for only one year for his misconduct. *Id.* Some cases in which more severe sanctions were imposed for lying under oath involved more aggravated circumstances or were the subject of mandatory disbarment by statute. *See, e.g., In re Mann,* 883 A.2d 887 (D.C.2005) (indefinite suspension for offenses including lying under oath, fraud

---

**7.** These rules respectively cover: "conduct involving dishonesty, fraud, deceit, or misrepresentation"; conduct prejudicial to the administration of justice; and the prohibition against assisting a client with illegal or fraudulent conduct. DR 1–102(A)(4),(5) and (7).

and other criminal conduct in a reciprocal discipline case); *In re White*, 698 A.2d 483 (D.C.1997) (disbarment under D.C.Code § 11–2503 where the attorney was convicted of passport fraud (willfully and knowingly making false statements in application for a U.S. passport), a crime of moral turpitude); *Goffe, supra*, 641 A.2d at 465 (disbarment where the attorney "manufactured evidence for use before the IRS, lied under oath to the Tax Court, and continued to lie about his actions to the Hearing Committee"). Respondent's case is more like *Thompson*, than these other cases involving giving false testimony, and therefore, reference should be made to *Thompson* in determining her sanction.

### B. *Imperfect Analogy to Misappropriation Cases*

While respondent's attempt to secure a fee from the court by false representations is extremely serious, it is not of the *Addams* variety which represents the reprehensible "breach of trust to the client." *See Addams*, 579 A.2d at 198–99. As we explained subsequently,

> A clear rational basis exists for this conclusion that attorneys who knowingly misappropriate client funds stand in a different position than attorneys who commit other acts involving dishonesty. As we also stated in *Addams*, the intentional misappropriation of client funds *"strike[s] at the core of the attorney-client relationship "* by undermining the public's faith that attorneys will fulfill their duties as fiduciaries with regard to the host of financial transactions that require a client to entrust funds to his attorney.... For this reason, "[t]he appearance of a tolerant attitude toward

known embezzlers would undermine public confidence in the integrity of the profession and of the legal system whose functioning depends on lawyers."

*In re Dulansey*, 606 A.2d 189, 190–91 (D.C.1992) (quoting *Addams*, 579 A.2d at 193) (emphasis added). Respondent's misconduct involved no breach of trust to her client, and therefore, does not fit into this framework. Although an argument can be made that a lawyer's attempt to secure funds by fraud or deceit from any source should be subject to the *Addams* rule, our precedents have not taken us there. *See Pennington, supra*, 921 A.2d at 141. To do so in this case will result in a disparate sanction for respondent as compared with other attorneys who have been disciplined for similar misconduct. *See, e.g., Elgin, supra*, 918 A.2d at 375, 384 (six-month suspension and $5000 in restitution for attorney who used client's credit card for personal expenses); *Schneider, supra* note 5, 553 A.2d at 207, 209, 212 (thirty-day suspension for attorney who falsified credit receipts to obtain reimbursement from law firm for expenses that stood to be charged to the client).

### C. *The Board's Recommended Sanction Meets the Objectives of Attorney Discipline*

Respondent's misconduct is based upon a single episode in which she submitted for payment a voucher seeking compensation under the Criminal Justice Act for services, some of which she knew that she had not rendered.[8] In doing so, respondent violated four disciplinary rules, 1.5(a), 3.3(a)(1), 8.4(c), and 8.4(d). The conduct leading to these disciplinary violations is quite serious in itself, a factor for consider-

---

8. The Board found that "the record does not support a finding that Respondent billed for a greater amount of time than she actually spent on the extradition matter in question. But what the record does support is the finding that Respondent's description of her specific activities in the voucher was false."

ation in determining sanction. *See Elgin, supra,* 918 A.2d at 376. The Board has also found that respondent gave false testimony at the disciplinary hearing when she supported a voucher that she knew was not accurate, particularly her testimony concerning a jail visit which she had to know had not taken place. Failure to acknowledge the wrongful conduct is an appropriate factor for consideration in determining sanction. *Id.* In considering this additional factor, the Board has recommended a longer suspension than it had previously and determined that a fitness requirement is in order. Here, the Board states that it takes its cue from *Cleaver–Bascombe I,* where the Court stated:

> Where an attorney has deliberately falsified a voucher and sought compensation for work that he or she has not devoted to the case, that attorney's fitness to practice is called into serious question. This is especially true if the attorney has compounded his or her initial fraud by testifying falsely during the resulting disciplinary proceedings.

892 A.2d at 398; *see also Cater, supra,* 887 A.2d at 22.

In making its sanction recommendation, the Board found substantial similarities between this case and *In re Parshall,* 878 A.2d 1253 (D.C.2005). In *Parshall,* this Court suspended an attorney for eighteen months for submitting a false status report to a court and attaching fabricated documents to support the report. The Board recommended, and the Court accepted its recommendation, for an eighteen-month suspension in light of the presence of sev-

eral mitigating factors, including the absence of prior disciplinary problems, the attorney's expressed regrets for his actions, cooperation with Bar Counsel, voluntary participation in *pro bono* programs, and representation of indigents. *Id.* at 1254, 1254 n. 4. In *Parshall,* this Court found the length of the suspension to be within the range of sanctions this Court has imposed for similar misconduct.[9] *Id.* at 1255 (citations omitted). I agree with the Board that *Parshall* has persuasive similarities. The Board recommended a longer sanction because in *Parshall,* unlike here, the attorney expressed regret for the misconduct and cooperated with the Office of Bar Counsel. Respondent identifies some mitigating factors in her favor, including the absence of prior discipline or prejudice to her client. "[T]he fact an attorney has had no prior disciplinary sanctions imposed in the past is 'highly relevant and material' to the determination of appropriate sanction." *Reback, supra,* 513 A.2d at 231 (quoting *In re Cope,* 455 A.2d 1357, 1361 (D.C.1983)). While such factors are appropriate for consideration, *see Elgin, supra,* 918 A.2d at 376, respondent does not identify as many mitigating factors as the attorney in *Parshall.* There is also the aggravating factor of respondent's failure to acknowledge her misconduct. In light of her false testimony at the hearing concerning her voucher, the Board also recommends a longer suspension than in *Parshall* and a requirement of fitness before reinstatement. Under the circumstances, the Board's recommendation for a two-year suspension appears to be warranted.[10]

---

9. *Parshall* was a reciprocal discipline case in which the Court imposed a substantially greater sanction than that imposed by Maryland. *Parshall,* 878 A.2d at 1254.

10. An examination of cases from other jurisdictions shows that a wide range of sanctions has been imposed on attorneys who have sub-

mitted fraudulent payment requests for representing indigent defendants. *See, e.g., Iowa Supreme Court Bd. of Prof'l Ethics & Conduct v. Tofflemire,* 689 N.W.2d 83 (Iowa 2004) (two-year suspension); *In re Goldman,* 11 A.D.3d 178, 784 N.Y.S.2d 496 (N.Y.App.Div. 2004) (three-year suspension); *In re Perrone,*

Proof that an attorney has violated the disciplinary rules, thereby warranting a substantial period of suspension, is not necessarily sufficient to justify a fitness requirement. *Cater, supra,* 887 A.2d at 22. To justify imposition of a fitness requirement, there must be clear and convincing evidence in the record of the proceeding that calls into question respondent's fitness to practice law. *Id.* at 24. In making the recommendation for a fitness requirement in this case, the Board states that it takes its direction from the majority's opinion in *Cleaver–Bascombe I.* Here, the Board found by clear and convincing evidence that respondent submitted a voucher to the Court for services that she knew she had not rendered and aggravated her misconduct in doing so by testifying falsely about it at the disciplinary hearing. The Board's findings support its recommendation for a fitness requirement.[11] This requirement is directed toward assuring "that [the attorney's] 'resumption of the practice of law will not be detrimental to the integrity and standing of the Bar or to the administration of justice, or subversive to the public interest.'" *Cater, supra,* 887 A.2d at 22 (citation omitted).[12] The Board has determined after careful consideration that a lengthy suspension with a fitness requirement will be sufficient to protect the public, the courts, and the integrity of the profession.[13] The Board's recommended sanction falls within the range of acceptable outcomes; therefore, we should adopt it. *See Elgin, supra,* 918 A.2d at 376.

---

565 Pa. 563, 777 A.2d 413 (2001) (disbarment); *In re Stone,* 230 A.D.2d 481, 657 N.Y.S.2d 2 (N.Y.App.Div.1997) (one-year suspension). The Board's recommendation falls within this range of sanctions.

11. "[T]o justify requiring a suspended attorney to prove fitness as a condition of reinstatement, the record in the disciplinary proceeding must contain clear and convincing evidence that casts serious doubt on the attorney's continuing fitness to practice law." *Cater, supra,* 887 A.2d at 6.

12. We have observed previously that this process itself could take some eighteen months to two years. *See Cater, supra,* 887 A.2d at 23 (quoting *In re Edwards,* 870 A.2d 90, 97 (D.C.2005)) (observing that a fitness requirement "may have the practical effect of greatly prolonging—even tripling or quadrupling—a respondent's period of suspension"); *In re Bettis,* 855 A.2d 282, 288 n. 12 (D.C.2004) (indicating Bar Counsel's representation that the review process for proof of fitness could take one and a half to two years).

13. "The length of a period of suspension reflects the gravity of the attorney's misconduct and is fixed with the aim of individual correction as well as general deterrence." *Cater, supra,* 887 A.2d at 23.