In re G. Paul HOWES, Respondent.

A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 434709).

No. 10–BG–938.

District of Columbia Court of Appeals.

Argued March 8, 2011.
Decided March 8, 2012.*
Amended June 7, 2012.

---

* This opinion was originally issued on March 8, 2012. We now issue this amended opinion to clarify that the effective date of respondent's disbarment was set *nunc pro tunc* to September 30, 2010, the entry date of respondent's interim suspension, in light of respondent's timely filing of an affidavit pursuant to D.C. Bar R. XI, § 14(g). *See In re Kline,* 11 A.3d 261, 267–68 (D.C.2011); *In re Mulkeen,* 606 A.2d 136, 137 (D.C.1992).

Paul L. Knight, Washington, for respondent.

Elizabeth A. Herman, Deputy Bar Counsel, with whom Wallace E. Shipp, Jr., Bar Counsel, and Judith Hetherton, Senior Assistant Bar Counsel, were on the brief, for the Office of Bar Counsel.

Before BLACKBURNE–RIGSBY, Associate Judge, and PRYOR and REID,** Senior Judges.

** Judge Reid was an Associate Judge of the court at the time of argument. Her status changed to Senior Judge on December 12, 2011.

BLACKBURNE–RIGSBY, Associate Judge:

This case arises out of the disciplinary proceeding involving respondent, G. Paul Howes, a former Assistant United States Attorney ("AUSA"), who wrongfully distributed more than $42,000 worth of witness vouchers in several felony prosecutions to individuals who were ineligible to receive them under 28 U.S.C. § 1821, as implemented by 28 C.F.R. § 21 (1986). Respondent compounded this initial misconduct by failing to disclose the voucher payments to either the court or opposing counsel, pursuant to District of Columbia Rules of Professional Conduct Rule 3.8(e), *Brady v. Maryland*, and *Giglio v. United States*, even though such payments were relevant to the jurors' credibility determinations of key government witnesses' testimony.[1] Finally, respondent intentionally misrepresented to the court that such disclosures had been made. Respondent's egregious conduct resulted in the substantial reduction of sentences for at least nine convicted felons and violated District of Columbia Rules of Professional Conduct ("Rules of Professional Conduct") 3.3(a), 3.4(c), 3.8(e), 8.4(a), 8.4(b), 8.4(c), and 8.4(d). At issue in this proceeding is the question of the appropriate sanction for respondent's conduct, and, for the first time, we are asked to consider the appropriate sanction in the context of misconduct by a federal prosecutor. A fractured five-to-four majority of the Board on Professional Responsibility ("Board") voted to suspend, rather than disbar, respondent. Divided in its recommendation for respondent's sanction, the Board issued four separate reports, with recommendations ranging in severity from a one-year suspension without a fitness requirement to disbarment. Respondent, in his exception to the Board's report, urges the court to suspend him for a term of one year without a fitness requirement, as in *In re McBride*, 642 A.2d 1270 (D.C.1994) (per curiam) and *In re Hutchinson*, 534 A.2d 919 (D.C.1987) (en banc), highlighting mitigating factors, such as altruistic motivation behind the misconduct and absence of a disciplinary record. In its exception to the Board's

---

1. 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (collectively referred to as "*Brady/Giglio* "). Respondent stipulated to the violation of his disclosure duties under *Brady/Giglio*, stating that "[b]enefits provided directly or indirectly to cooperating government witnesses by the government could have been relevant to the jurors' duty to determine credibility and weigh bias." Respondent later admitted, in his Stipulation of Facts and Charges, that, despite defendants' requests for evidence of all voucher payments by the government, he "repeatedly and falsely assured the court and defense counsel that he had provided all *Brady* and *Giglio* information to the defense." *See Brady, supra*, 373 U.S. at 87, 83 S.Ct. 1194 ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."); *Giglio, supra*, 405 U.S. at 154, 92 S.Ct. 763 (holding that where the government has failed to disclose impeachment or exculpatory information about a defendant prior to trial, a finding of materiality is required before a new trial is warranted). We decline to substantively address the applicability of *Brady/Giglio* to witness vouchers. Instead, we adopt the finding of the Hearing Committee: "We find that an ethical violation occurred because *Respondent stipulated to it in a document he and his counsel signed.*" *See In re Steinberg*, 761 A.2d 279, 283 (D.C.2000) (per curiam) ("Before the Hearing Committee, Respondent conceded the violations and admitted responsibility when he stipulated to both the underlying facts and the charged violations."). From this conclusion, the Hearing Committee found that there was clear and convincing evidence that respondent violated Rule 3.8(e), which requires prosecutors to disclose materials which "the prosecutor knows or reasonably should know tends to negate the guilt of the accused."

recommendation, Bar Counsel argues that any mitigating factors regarding respondent's conduct are outweighed by the overwhelming aggravating factors and disbarment is, therefore, the appropriate sanction for respondent's misconduct, consistent with the recommendation of four members of the Board and with our recent decisions in *In re Cleaver–Bascombe*, 986 A.2d 1191 (D.C.2010) (per curiam) (hereinafter "*Cleaver–Bascombe II*") and *In re Kanu*, 5 A.3d 1 (D.C.2010).

■ This court is granted substantial discretion to fashion a proportionate disciplinary sanction when the misconduct is novel to our jurisdiction and where the recommendations of the Board are divided. *See In re Cleaver–Bascombe*, 892 A.2d 396, 402 (D.C.2006) (hereinafter "*Cleaver–Bascombe I*"); *In re Addams*, 579 A.2d 190, 192 n. 3 (D.C.1990) (en banc). Respondent's misconduct is decidedly egregious and, though we have not yet sanctioned a prosecutor in like circumstances, it is a logical extension of our prior cases to find disbarment warranted over a lesser sanction. We are not dissuaded from our view that disbarment is the appropriate sanction, despite respondent's exceptions and request for a mitigated sanction, as there is clear and convincing evidence that respondent misused federal witness voucher funds, misled the court and defense counsel, and violated his duties as a prosecutor, resulting in substantial reductions in sentences for several convicted felons. Nor do we accept respondent's contention that his cooperation with Bar Counsel, the absence of prior discipline, the absence of

personal financial gain, or the delay in the proceedings are mitigating factors which should preclude imposition of our most stringent sanction. Respondent's misconduct was significantly compounded by the protracted and extensive nature of the dishonesty involved. We conclude, for reason discussed below, that, on this record, disbarment is the appropriate sanction.

### I.

### FACTUAL AND PROCEDURAL BACKGROUND

Respondent's violations of the Rules of Professional Conduct arose from his misuse of witness vouchers from 1993 to 1995, while he was an AUSA in the United States Attorney's Office for the District of Columbia ("USAO") investigating and prosecuting gang and drug-related murders in three cases: (1) in the Superior Court of the District of Columbia ("Superior Court"), *United States v. Card*, No. F–7682–91 (D.C.Super.Ct.1994), *United States v. Rice*, No. F–6601–92 (D.C.Super.Ct.1994), and *United States v. Edwards*, No. F–4437–92 (D.C.Super.Ct.1994) (collectively, the "*Card/Moore*" case)[2]; (2) in the United States District Court for the District of Columbia ("District Court"), *United States v. Hoyle*, No. CR–92–284 (D.D.C.1994), *United States v. McCollough*, No. CR–92–284 (D.D.C.1994), *United States v. Goldston*, No. CR–92–284 (D.D.C.1994), and *United States v. Harris*, No. CR–92–284 (D.D.C.1994) (collectively, the "*Newton Street Crew*" case)[3]; and (3)

**2.** From September 1993 to April 1994, respondent was the sole prosecutor in the criminal case of Javier Card, Fonda Moore, and other associated defendants in the Superior Court of the District of Columbia in the *Card/Moore* case. The case involved drug conspiracy, murder, and murder conspiracy charges arising from a multi-year investigation.

Three of the defendants were convicted with lengthy sentences ranging from 40 years to life to 69 years to life (mandatory minimum of 25 years).

**3.** The day after the conclusion of the *Card/Moore* trial, respondent (as lead prosecutor) and two other AUSAs began a criminal trial

an unrelated alleged sexual assault case (the "*Jones*" case).[4] As an AUSA, respondent had the authority to issue vouchers for payment of witness fees to individuals. *See* 28 C.F.R. § 21.4(a) (1986) (which allows a fact witness to be paid an "attendance fee . . . for each day's attendance" at a judicial proceeding "for the time necessarily occupied in going to and returning from the place of attendance").[5] The regulation also allows for modest transportation and subsistence expenses.[6] However, 28 U.S.C. § 1821(f) states that "any witness who is incarcerated at the time that his or her testimony is given . . . may not receive fees or allowances under this section," and 28 C.F.R. § 21.4(d) reiterates this limitation on voucher use. *See* 28 C.F.R. § 21.4(d) ("A witness in custody . . . is ineligible to receive the attendance and subsistence fees provided by this section."). Respondent stipulated that he, despite these regulatory limitations, issued vouchers to incarcerated witnesses, though he knew the practice to be prohibited, and provided vouchers to the "family and friends of government witnesses for unauthorized purposes."

The United States Department of Justice Office of Professional Responsibility ("OPR") conducted an internal investigation from March 1996 to February 1998 of respondent's conduct in the *Newton Street Crew* case.[7] OPR examined 719 vouchers, 684 of which "were signed by or on behalf of G. Paul Howes," entailing total payments to government witnesses in the amount of $140,918.14. OPR determined that many individuals "received payments that could not be explained adequately by anyone [OPR] interviewed," finding "strong evidence that [respondent] intentionally abused the witness voucher system in several ways." OPR concluded that this evidence gave "rise to a strong inference that many of the vouchers were issued improperly in that they did not compensate a witness for an appearance to prepare for or give trial testimony, or even to provide the sort of intelligence information provided by informants." OPR determined that any mitigating factors were outweighed by aggravating factors, which were overwhelming, including the extended duration of the repeated misconduct, respondent's issuance of vouchers even after the conclusion of his work at the

---

in the United States District Court for the District of Columbia against Mark Hoyle and co-defendants who were part of the Newton Street Crew gang. The case involved continuing criminal enterprise, Racketeer Influenced and Corrupt Organizations ("RICO") Act conspiracy, drug conspiracy, murder, and murder conspiracy charges arising from a multi-year investigation. In October 1994, the trial resulted in multiple life sentences for four of the defendants.

4. Respondent was involved in the investigation of the *Jones* case, but the case did not proceed beyond the investigative stage.

5. Section 21.1(c) defines judicial proceeding as: "Any action or suit, including any condemnation, preliminary, informational or other proceeding of a judicial nature." 28 C.F.R. § 21.1(c). Judicial proceedings in-

clude pre-trial conferences and grand jury proceedings. *Id.*

6. The Hearing Committee found that "[d]uring the relevant time period, witnesses were paid $40 per day for each day of attendance in a federal case," as is permitted under 28 U.S.C. § 1821. Though Department of Justice regulation, 28 C.F.R. § 21.4, states that "a witness shall be paid an attendance fee of $30 per day for each day's attendance," the discrepancy between the regulation and statute is due to the failure to update the regulation and does not reflect a basis for respondent's misconduct.

7. The OPR investigation was prompted when an inmate asked another prosecutor to give him a voucher similar to those supplied by respondent to five other incarcerated witnesses.

USAO, and respondent's "non-disclosure of voucher payments made to relatives and girlfriends of government witnesses to the court and defense counsel," all of which demonstrated that respondent had "committed intentional professional misconduct."

Upon its completion, the OPR Report was disclosed, initially under seal, to the United States District Court for the District of Columbia, which ultimately resulted in each convicted defendant in the *Newton Street Crew* case filing motions for new trials based on respondent's misconduct. In March 2002, the government agreed not to oppose the four defendants' motions, instead stipulating to significantly reduced sentences. Mark Hoyle, originally sentenced to eight life terms, plus twenty-five years, had his sentence reduced to twenty-eight years. *United States v. Hoyle*, No. CR–92–284 (D.D.C.1994). John McCollough, originally sentenced to nine life terms, plus eighty-five years, had his sentence lowered to twenty-eight years. *United States v. McCollough*, No. CR–92–284 (D.D.C.1994). Anthony Goldston, originally sentenced to four life terms, plus five years received a reduced sentence of eighteen years, which ran concurrent with his Superior Court sentence. *United States v. Golston*, No. CR–92–284 (D.D.C. 1994). Finally, Mario Harris, originally sentenced to five life terms, plus twenty-five years, received a reduced sentence of eighteen years.[8] *United States v. Harris*, No. CR–92–284 (D.D.C.1994).

Defense counsel in the *Card/Moore* case became aware of the post-conviction litigation in the *Newton Street Crew* case, inspiring them to file similar motions to vacate their clients' convictions in the Superior Court of the District of Columbia. The government, again, declined to oppose the motions and instead offered stipulated dispositions. Javier Card, originally sentenced to sixty-nine years to life in *United States v. Card*, No. F–7682–91 (D.C.Super.Ct.1994) received a lowered sentence of twenty-three years to life, with the execution of all but twenty-three years suspended. Jerome Edwards, originally sentenced to sixty-one years to life (with a mandatory minimum of thirty years) in *United States v. Edwards*, No. F–4437–92 (D.C.Super.Ct.1994) received a reduced sentence of twenty-three years to life (with the execution of all but twenty-three years suspended). Finally, Antoine Rice in *United States v. Rice*, No. F–6601–92 (D.C.Super.Ct.1994) was originally sentenced to forty years to life (with a mandatory minimum of twenty-five years) and received a lowered sentence of five to fifteen years.

### A. Bar Counsel's Investigation

Bar Counsel learned of respondent's prosecutorial misconduct from newspaper coverage about post-conviction litigation in the *Newton Street Crew* case, obtained a partially redacted version of the OPR Report and subsequently instituted its own investigation. Following the investigation, Bar Counsel and respondent negotiated a Stipulation of Facts and Charges ("Stipulation"). In the June 2006 Stipulation, respondent admitted to multiple violations of six Rules of Professional Conduct in the *Newton Street Crew*, *Card/Moore* and *Jones* cases: (1) Rule 3.3(a) (false statement of material fact or law to a tribunal); (2) Rule 3.4(c) (disobeying an obligation

---

8. Respondent also prosecuted two criminal defendants, Donnie Strothers and William Hoyle, prior to his involvement with the *Newton Street Crew* case, though their trials involved several witnesses who later testified in the *Newton Street Crew* case. Based on this overlap, the government additionally agreed to stipulated dispositions for Strothers and Hoyle, reducing the defendants' thirty-year sentences to fourteen-and-a-half years.

under the rules of a tribunal); (3) Rule 3.8(e) (failing to timely disclose evidence that tended to negate the guilt of the accused); (4) Rule 8.4(a) (violating or assisting in violating the Rules of Professional Conduct); (5) Rule 8.4(c) (engaging in conduct involving dishonesty or misrepresentation); and (6) Rule 8.4(d) (engaging in conduct that seriously interfered with the administration of justice).

Bar Counsel subsequently filed a Petition Instituting Formal Disciplinary Proceedings and an accompanying Specification of Charges, which, in addition to violation of the six rules identified in respondent's Stipulation, accused respondent of two additional violations in the *Card/Moore, Newton Street Crew,* and *Jones* cases: Rule 8.4(b) (committing a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness to practice law) and Rule 3.4(b) (offering a prohibited inducement to a witness). In its petition, Bar Counsel recommended that Howes be suspended for two years with a fitness requirement, stating that it "[n]ormally . . . would recommend disbarment for misconduct as serious and extensive as that of [r]espondent," but due to "mitigating factors [respondent's stipulations and cooperation with Bar Counsel, and the delay between the charged misconduct and the institution of disciplinary proceedings] . . . a substantial suspension of at least two years with a fitness require-

ment, would be adequate to protect the courts, the public, and the integrity and standing of the Bar."

B. *Hearing Committee Report and Recommendations*

An evidentiary hearing was held before Hearing Committee Number One of the Board on Professional Responsibility ("Hearing Committee") in May 2007, and a report was issued the following August. The two-person [9] Hearing Committee observed that Bar Counsel and respondent "fundamentally differ[ed] as to what the Stipulation[ ] mean[t], with [r]espondent perceiving only technical violations in areas where Bar Counsel allege[d] serious, substantive, and deliberate ethical breaches." This fundamental difference required the Hearing Committee to consider additional evidence of respondent's conduct beyond the conduct referenced in the Stipulation to reach its conclusions.

Ultimately, the Hearing Committee found that the following six Rule violations,[10] to which respondent stipulated, were supported by clear and convincing evidence:

1) issuing witness vouchers worth more than $42,000 to friends and relatives of government witnesses, not to serve as witnesses but to help the witnesses maintain their "resolve" to testify for the government in the *Card/Moore* and *Newton Street Crew* cases (in violation of Rules 3.3(a), 3.4(c), 8.4(a), 8.4(c), and 8.4(d)); [11]

---

**9.** The third member (the Hearing Committee Chair) recused himself.

**10.** Notably, the Hearing Committee did not find that respondent violated Rule 3.8(e) in connection with the *Jones* case, because the proceedings in *Jones* did not progress beyond the investigatory state. Further, the Hearing Committee did not find that respondent violated his ethical obligations under the Rules by issuing witness vouchers to non-testifying cooperators, as the USAO's common practice

was to issue vouchers to individuals who provided information, despite not being subpoenaed to appear as witnesses before a grand jury or at trial. The Hearing Committee reached this conclusion even though this common practice was technically against the law. *See* 28 U.S.C. § 1821; 28 C.F.R. §§ 21.1(c); 21.4.

**11.** The Hearing Committee did not find that this conduct violated Rule 8.4(b), for committing a criminal act which reflects adversely on

2) "miscaptioning" witness vouchers by issuing federal court vouchers (*Newton Street Crew* case) to witnesses in connection with a Superior Court case (*Card/Moore* case), consequently impeding discovery in the *Card/Moore* case by frustrating opposing counsel's efforts to subpoena information concerning payments to government witnesses and continuing an intentional effort to conceal both the miscaptioning and respondent's misuse (in violation of Rules 3.3(a), 3.4(c), 3.8(e), 8.4(a), 8.4(c), and 8.4(d));

3) using witness vouchers to compensate two retired police detectives for their work in assisting respondent as "case agents" in the *Card/Moore* and *Newton Street Crew* cases, for periods from 68 to 167 days, though they testified only for one to three days (in violation of Rules 3.3(a), 3.4(c), 8.4(a), 8.4(b), 8.4(c), and 8.4(d));

4) using witness vouchers to make unlawful and excessive payments to incarcerated witnesses, prohibited both by their plea agreements and under 28 U.S.C. § 1821(f), in the *Card/Moore* and *Newton Street Crew* cases since there was "no federal money," and because he wanted to ensure that the incarcerated witnesses "wouldn't revert ... [and] wouldn't get killed...." (in violation of Rules 3.3(a), 3.4(c), 8.4(a), 8.4(b), 8.4(c), and 8.4(d));

5) using witness vouchers to make other unlawful and improper payments in the *Jones* case (issuing vouchers under the *Newton Street Crew* case caption to members of the Jones family even after respondent left the USAO) and in the *Card/Moore* case (to a Philadelphia police detective who only testified one day, but received 3 days worth of federal vouchers) (in violation of Rules 3.3(a), 3.4(c), 8.4(a), 8.4(b), 8.4(c), and 8.4(d)); and

6) failing to disclose the improper vouchers as potentially exculpatory evidence to criminal defendants in the *Card/Moore* and *Newton Street Crew* cases, where the prosecution's case depended largely on the highly contested credibility of cooperating incarcerated coconspirators, where defendants made requests regarding witness voucher recipients and where respondent repeatedly assured defendants and the court that all exculpatory evidence had been disclosed (in violation of Rule 3.8(e)).

In addition to the six aforementioned charges, to which respondent stipulated, the Hearing Committee also found that a Rule 8.4(b) violation was supported by clear and convincing evidence in each of the three groups of cases:

[There was] clear and convincing evidence that [r]espondent's conduct constituted false statements and certifications in violation of 18 U.S.C. §§ 1001 and 1018—criminal acts that reflect adversely on his honesty, trustworthiness or fitness—when he 1) signed vouchers for incarcerated witnesses even though he knew that those witnesses were not entitled to receive vouchers; 2) used vouchers to compensate retired police detectives ... for their work as 'case agents'; 3) used witness vouchers to compensate two Jones children who were not fact witnesses; and, 4) used vouchers to

the lawyer's honesty, trustworthiness, or fitness to practice law. Though the Stipulation named 18 friends and relatives of six different cooperating incarcerated government witnesses who received over $42,000 during the *Newton Street Crew* case, the Hearing Committee concluded that record evidence supported the view that respondent issued numerous vouchers for relatives of incarcerated witnesses to compensate them for helping witnesses "maintain their resolve to testify for the government," and that most of the voucher payments were proper in that the various recipients also provided some "case-related" information.

compensate the Jones family for dates of supposed meetings with [r]espondent after he left the USAO.

Overall, the Hearing Committee found that respondent committed twenty ethical violations (seventeen stipulated and three non-stipulated) of seven ethical rules in three separate groups of cases from 1993 to 1995.[12]

Despite agreement about the factual findings and legal conclusions underlying respondent's misconduct, the Hearing Committee was divided as to the appropriate sanction. The Hearing Committee Report noted that "[b]roadly speaking, the record reflects two core types of misconduct[:] misapplication of public funds and failure to disclose information required to be provided to criminal defendants[,]" concluding that the "seriousness of the misconduct overwhelms any mitigating factors, including the delay in this case which has been substantial." [13] One member recommended a two-year suspension with a fitness requirement based on Bar Counsel's recommendation, but noted that he would have recommended disbarment but for Bar Counsel's recommendation.[14] The member deferred to the Board and our court as to whether respondent's case warranted such a departure from the recommended sanction. However, the other member recommended disbarment because the "gravity of the misconduct support[ed] ... an upward departure [15] from Bar Counsel's recommended sanction," stating:

> [T]he misconduct in this record appears capable of supporting disbarment *either* on the basis of [r]espondent's defalcations from public funds entrusted to his control or on the basis of his prosecutorial misconduct relating to *Brady* and *Giglio* violations. Taken together, and particularly in consideration of the extensive dishonesty involved, the Committee believes that the record in this matter amply supports the sanction of disbarment.

(Emphasis added.) Respondent filed his exceptions to the Hearing Committee Re-

---

**12.** The Hearing Committee found no basis for a Rule 3.4(b) violation of offering a prohibited inducement to a witness, consistent with OPR's conclusion, because there was no evidence that any witness ever changed his or her testimony due to the vouchers.

**13.** Delay in proceedings has historically been viewed as a mitigating factor, when determining the appropriate sanction for attorney misconduct. *See In re Ponds*, 888 A.2d 234, 240–44 (D.C.2005); *see also In re Schneider*, 553 A.2d 206, 212 (D.C.1989) (Board recommended six-month suspension as disciplinary process had "dragged" into sixth year); *In re Hessler*, 549 A.2d 700, 716 (D.C.1988) (Board took into account two-year delay in disciplinary process to mitigate sanction). Respondent argues that the delay of this matter resulted in "his restriction by his firm's major client from presenting his cases in a courtroom" and his vilification "in the national press for more than eight years based on these charges." Respondent further alleged

that the "repeated public condemnations have significantly limited his practice." These arguments will be addressed further in our discussion of mitigating and aggravating factors determinative of an appropriate sanction for respondent's misconduct.

**14.** The Hearing Report noted that "although Bar Counsel's recommendation could be understood as a *minimum* recommended discipline—i.e., 'at least two years suspension with fitness'—Bar Counsel appears to have considered and rejected disbarment."

**15.** The Hearing Committee member's hesitation to make an upward departure from Bar Counsel's recommended sanction was based upon the language of *Cleaver–Bascombe I*, which stated that "although the court is not precluded from imposing a more severe sanction than that proposed by the prosecuting authority, that is and surely should be the exception, not the norm...." *Cleaver–Bascombe I, supra*, 892 A.2d at 412 n. 14.

port on August 31, 2009, and the parties filed their briefs with the Board thereafter.

## C. *Board Report and Recommendations*

The Board issued its Report in July 2010, unanimously adopting the findings and legal conclusions of the Hearing Committee; however, the nine members of the Board were divided as to the appropriate sanction.[16] Respondent argued to the Board that a three to six-month suspension "may be appropriate," but because of mitigating factors (the delay in handling his case and his "ethical and honest practice for the last 14 years"), a 30–day suspension without a fitness requirement upon reinstatement was more appropriate. Bar Counsel modified its recommended sanction by adding to its request for a suspension of at least two years with a fitness requirement upon reinstatement, "if not a greater sanction up to and including disbarment."

Five members of the Board supported some form of suspension, but were divided between two separate reports. Three members supported Board Member Ray Bolze's report ("Bolze Report"), recommending a three-year suspension without a fitness requirement upon reinstatement. The Bolze Report recognized the gravity of respondent's conduct, noting that "[c]learly, the scope of misconduct here calls for a severe sanction." However, the Bolze Report also distinguished respondent's conduct from cases in which we have disbarred attorneys for misappropriation of funds and flagrant dishonesty, noting that "[h]ere, there was no taking of money for personal gain," and "no perjury, no fabrication of false documents for per-

sonal benefit, and no falsehoods to Bar Counsel or the Hearing Committee." Mr. Bolze also noted that despite the numerous violations with which respondent was charged, there were "strong mitigating factors," including respondent's "motive for not disclosing certain voucher payments" due to risk of harm to cooperatives, the "lapse of time since the conduct in question," the "lack of any meaningful prior disciplinary history," "[r]espondent's cooperation with Bar Counsel leading to an agreement on a detailed Stipulation," and "the array of testaments as to [r]espondent's good conduct in the practice of law since the events involved here." Two other Board members, joining Board Member James Mercurio's report ("Mercurio Report"), recommended the least stringent sanction of a one-year suspension without a fitness requirement upon restatement. Mr. Mercurio found disbarment inappropriate because respondent's conduct could not "reasonably be seen as akin to intentional misappropriation or flagrant dishonesty," emphasizing respondent's motives as a mitigating factor. The Mercurio Report stated:

> No one has suggested that the funds expended through the vouchers [r]espondent signed were not prudently and efficiently directed toward achievement of the highly important public goals that [r]espondent was pursuing during the *Card/Moore* and *Newton Street Crew* cases. Under these circumstances, the disciplinary mission to protect the public, the courts and the legal profession does not … require that [r]espondent be dealt a career-ending sanction … [when] the USAO … had been misus-

---

16. The Board's adoption of the Hearing Committee's findings of fact and conclusions of law took note of several minor exceptions, but the Board's "areas of disagreement with the Hearing Committee's factual findings and conclusions of law [we]re not material to the sanction." As our analysis centers upon the appropriate sanction for respondent's conduct, we need not address those discrepancies here.

ing [the voucher system] for many years.

The Mercurio Report also noted respondent's moral fitness to practice law was demonstrated "not only by the two judges who offered character testimony in the hearing," but also through numerous character letters, performance evaluations, and awards that respondent introduced into evidence.

Alternatively, four members of the Board favored disbarment and two separate reports in support of disbarment were prepared. Three members supported Board Member Deborah Jeffrey's report ("Jeffrey Report"), concluding that disbarment was appropriate because it was "necessary and appropriate to express the condemnation that [r]espondent's conduct merits and to deter others from similar misconduct." Board Member Theodore Frank's report ("Frank Report") recommended disbarment on narrower grounds, noting that the Jeffrey Report "d[id] not adequately recognize the difficulties [r]espondent faced in prosecuting two complex criminal cases where the lives of his witnesses, members of their family or their friends were at risk," and instead should consider the totality of respondent's violations in recommending disbarment. The Frank Report further noted that if the "only violations [had been] the misuse of

vouchers ... suspension [would be] appropriate," but respondent's "intentional deception of the court and defense counsel, when coupled with the other violations [of misuse of vouchers], crosses the line from misconduct which warrants a suspension to misconduct that requires disbarment."

This case is now before us on exceptions by respondent and Bar Counsel to the Board's Report, with respondent taking exception [17] to the Board's findings of fact and recommended sanctions and Bar Counsel taking exception only to sanctions. On September 30, 2010, this court suspended respondent pursuant to D.C.Bar. R. XI § 9(g) because respondent failed to show cause why he should not be suspended pending our consideration of this disciplinary matter.

## II.

### STANDARD OF REVIEW

■ The discipline of attorneys, including determination of appropriate sanctions, is the responsibility of this court. *Cleaver–Bascombe II, supra,* 986 A.2d at 1195 (citing *Hutchinson, supra,* 534 A.2d at 924). Though we review *de novo* the Board's legal conclusions, we must accept the Board's evidentiary findings if they are supported by substantial evidence in the record.[18] *Cleaver–Bascombe I, supra,* 892

17. In his brief taking exception to the Board Report, respondent additionally alleges that the Hearing Committee and Board deprived him of due process because the Specification of Charges and the Bar Counsel's pre-hearing filings failed to "put [him] on notice that misapplication of funds under 18 U.S.C. § 641 or misappropriation was even in issue." However, we can quickly dispose of this issue, as the Hearing Committee did not find that respondent violated Rule 8.4(b) based on a violation of 18 U.S.C. § 641. The Hearing Committee was careful to limit its finding that respondent violated Rule 8.4(b) based on the charged criminal conduct, which was violating 18 U.S.C. §§ 1001 and

1008. Instead, the Hearing Committee's mention of 18 U.S.C. § 641, in its determination of an appropriate sanction for respondent's conduct, was intended to consider whether our case law on the misapplication or misappropriation of funds was persuasive in this context. In any event, given that respondent stipulated to facts pertaining to witness vouchers, which come out of public funds, he was on notice that misapplication and misappropriation of funds were at issue.

18. The Board must accept the Hearing Committee's findings under the same standard, adopting the Hearing Committee's findings when they are based upon substantial record

A.2d at 401–2 (*citing In re Hallmark*, 831 A.2d 366, 371 (D.C.2003)). "Generally speaking, if the Board's recommended sanction falls within a wide range of acceptable outcomes, it will be adopted and imposed." *Id.* (quoting *In re Soininen*, 853 A.2d 712, 723 (D.C.2004)) (citations and internal quotation marks omitted). We grant deference to the recommended disposition of the Board "unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." *Cleaver–Bascombe II*, *supra*, 986 A.2d at 1194 (quoting D.C. Bar R. XI, § 9(h)) (internal quotation marks omitted). However, "the responsibility for imposing sanctions rests with the court in the first instance." *Cleaver–Bascombe I*, *supra*, 892 A.2d at 402 (quoting *Soininen*, *supra*, 853 A.2d at 723).

 While we generally take a more deferential approach to Board determinations, this case warrants a more extensive review of the Board's recommendation for several reasons. This is the first occasion for this court to determine the appropriate sanction for prosecutorial misconduct like that of respondent. We have been "more assertive" in our review of the Board's recommendations where there have been no other cases of similar conduct, as compared to cases concerning "more familiar types of misconduct." *See Cleaver–Bascombe I*, *supra*, 892 A.2d at 402; *see also In re Reback*, 513 A.2d 226, 230 (D.C.1986) (en banc) ("Since this is the first occasion for this court to pass upon conduct like that of respondent[ ], there are no other cases of fully comparable conduct with which we must maintain consistency."). Further, where the Board's recommendations are divided among several disciplinary alternatives, we must make our determination based upon the specific facts of the case, examining the reasoning for each of the recommended sanctions. *See Addams*, *supra*, 579 A.2d at 192 n.3 (internal quotation marks and citations omitted). Should such review of the specific facts cause us to disagree with the Board "as to the seriousness of the offense or the demands of consistency, however, the Board's recommendations are accordingly granted less weight." *In re Goffe*, 641 A.2d 458, 464 (D.C.1994) (citations and internal quotation mark omitted). Ultimately, it is this court's weighty responsibility to impose an appropriate disciplinary sanction on a member of our Bar. *Cleaver–Bascombe II*, *supra*, 986 A.2d at 1195 (citing *In re Temple*, 629 A.2d 1203, 1207 (D.C.1993)). It is this responsibility that informs our consideration of the Board's findings and recommendations.

## III.

### RESPONDENT'S EXCEPTIONS

Respondent, taking exception to the Board's findings of fact, argues that the Hearing Committee findings adopted by the Board were not supported by substantial record evidence on two grounds: (1) the Hearing Committee "repeatedly resort[ed] to unsupported and conjectural statements," such as "we believe," or "it appears to us" whenever there was a lack of evidence to support its "hunches or beliefs"; and (2) the Hearing Committee made "numerous evidentiary assumptions" regarding the admissibility of certain evidence. We are unpersuaded by these arguments. In its report, the Board rejected a similar argument by respondent that the Hearing Committee's review of the record was "superficial," instead concluding that the "Hearing Committee's findings, set forth in a 90–page Report, were

evidence. *Cleaver–Bascombe I*, *supra*, 892 A.2d at 401.

supported by extensive references to the factual record, including numerous transcript quotes in support of its factual findings and legal conclusions." Furthermore, the Board stated that the Hearing Committee's conclusions of law and recommended sanction "display[ed] a firm grasp of the factual record, as well as a reasoned and measured use of the record to support the ... recommendations" and were "consistent with the [findings and conclusions of the] OPR Report." Notably, our review of the record demonstrates that the Hearing Committee's conclusions were not only substantiated by facts to which the respondent specifically stipulated, such as respondent's admission that he failed to disclose information pursuant to *Brady* and *Giglio*, but were also based upon "substantial material in the hearing record." Thus, we adopt the Board's findings of fact and conclusions of law, as they were "well supported by the extensive record." *In re Corizzi*, 803 A.2d 438, 439 (D.C.2002).

Respondent also took exception to the Board's recommended sanctions, arguing that the Board failed to adequately consider several mitigating factors, and therefore, "any suspension greater than one year would be unwarranted." Arguing that the Mercurio Report should be used as a basis for determining the appropriate discipline, respondent contends that the Mercurio Report necessarily considers "the moral duty of every prosecutor to protect cooperating witnesses from being murdered," to justify respondent's improper, but selfless, use of vouchers. In his brief to the Board, respondent claims that, as a prosecutor, he was in a "boiling cauldron" that forced him to act as he did. Respondent further claims that his use of vouchers was in accordance with a common, unwritten practice at the USAO, and that this served as a mitigating factor. An additional mitigating factor, respondent argues, was the "extraordinary delay" that

occurred in this matter, resulting in prejudice against him. Finally, respondent highlights his unblemished disciplinary record prior to and after the misconduct at issue in this case and notes that such ethical consistency warrants mitigation of his sanction. We are unpersuaded by respondent's exceptions. As we discuss below, any mitigating factors are far outweighed by the aggravating factors in this case.

## IV.

### BAR COUNSEL'S EXCEPTIONS

Bar Counsel took only limited exception to the Board's report "insofar as a majority of the Board failed to recommend the sanction of disbarment." Instead, Bar Counsel focused its arguments on the issue of whether the mitigating factors identified by respondent were sufficient to justify less severe discipline, and concluded that they were not. Bar Counsel, noting that it originally felt compelled to recommend discipline less severe than disbarment, now found disbarment to be the appropriate sanction where the mitigating factors of respondent's stipulations and the length of time since the misconduct were insufficient to justify less extreme punishment. Bar Counsel further warned that any less stringent sanction would "reinforce [r]espondent's attitude that the end justifies the means and the sanction would fail to deter others who may adopt this convenient attitude." Further, Bar Counsel argued that the following circumstances outweighed respondent's arguments for mitigation of sanction: (1) the seriousness, dishonesty and repeated nature of respondent's misconduct, ultimately harming the administration of justice; (2) respondent's past misconduct and conflicted acceptance of responsibility for the misconduct; (3) respondent's moral char-

acter; and (4) comparable cases encouraging broad justification of deterrence for more severe punishments.

## V.

## ANALYSIS

 We reserve the sanction of disbarment for the most extreme attorney misconduct, and have done so "in two types of dishonesty cases—(1) intentional or reckless misappropriation where the presumptive sanction is disbarment, and (2) dishonesty 'of the flagrant kind.' " *In re. Pelkey,* 962 A.2d 268, 281 (D.C.2008). Our case law does not warrant *per se* disbarment in all cases where attorney dishonesty is employed to misuse funds.[19] *Cleaver–Bascombe II, supra,* 986 A.2d at 1201 (Wagner, J., dissenting) (citing *In re Pennington,* 921 A.2d 135, 142 (D.C.2007)). However, where such dishonesty is aggravated and prolonged, disbarment is the appropriate sanction. *See Goffe, supra,* 641 A.2d at 461. Further, disbarment has been imposed as a sanction in cases where misconduct was subsequently concealed by deceit or fraud. *Cleaver–Bascombe II, supra,* 986 A.2d at 1200 ("[t]he attempted cover-up often exceeds the initial misconduct." (citation and internal quotation marks omitted)).

 In our most analogous case of disbarment for misuse of public funds, *Cleaver–Bascombe II,* we held that determination of an appropriate sanction required consideration of: "(1) the nature of the violation, [ (2) ] the mitigating and aggravating circumstances, [ (3) ] the need to protect the public, the courts, and the legal profession, and (4) the moral fitness of the attorney." *Cleaver–Bascombe II, supra,* 986 A.2d at 1195; *see Kanu, supra,* 5 A.3d at 14. We concluded that disbarment was the appropriate sanction where the attorney's single instance of voucher misuse and subsequent dishonesty to conceal her misconduct demonstrated that she "lack[ed] the moral fitness to remain a member of the legal profession." *Cleaver–Bascombe II, supra,* 986 A.2d at 1201. We further held that disbarment would serve our overarching "purpose of ... serv[ing] the public and professional interest and ... deter[ring] future and similar conduct." *Id.* Here, the public's interest in respondent's disbarment is far greater than in *Cleaver–Bascombe II,* because respondent's repeated, intentional misuse of and failure to disclose public witness vouchers for non-witnesses resulted in the substantial reduction of sentences for convicted felons and undermined public faith in prosecutors and the larger justice system. We apply the four-factor analysis of *Cleaver–Bascombe II* below, concluding that disbarment is the appropriate sanction in this case and that alternative sanctions recommended by the Board are insufficient to address respondent's extensive misconduct.

### A. Nature of the Violation

 In *Cleaver–Bascombe II, supra,* 986 A.2d at 1199, we held that there was no meaningful distinction between fraudu-

---

19. Though many cases of attorney dishonesty and misrepresentation have not been sanctioned with disbarment, they are distinguishable from this case by: (1) the scope and duration of the misconduct; (2) the likelihood for such misconduct to jeopardize the public; and (3) the corresponding demonstration of the attorney's lack of fitness to practice law. *See Hutchinson, supra,* 534 A.2d at 919 (attorney suspended for one year for providing false testimony to government); *In re Thompson,* 538 A.2d 247 (D.C.1987) (attorney suspended for one year for supporting client's use of false statements on immigration application); *In re Wild,* 361 A.2d 182 (D.C.1976) (attorney suspended for one year for unlawful campaign contributions).

lent submission of a voucher and other fraudulent conduct which automatically warrants disbarment, such as misappropriation of client funds, mail or wire fraud, felony theft of federal funds and other felony theft offenses. *See Addams, supra,* 579 A.2d at 191 (disbarment for misappropriation of client funds); *In re Bond,* 519 A.2d 165, 166 (D.C.1986) (per curiam) (disbarment for mail and wire fraud); *In re Patterson,* 833 A.2d 493, 493 (D.C.2003) (per curiam) (disbarment for felony theft of federal funds). More specifically, we stated that there was "no basis for distinguishing for the purpose of disciplinary sanction between stealing clients' funds and stealing public funds. *The fundamental element of basic dishonesty is the same.* Both reflect the lack of moral rectitude needed to be a member of the legal profession." *Cleaver–Bascombe II, supra,* 986 A.2d at 1199 (emphasis added). The nature of a case is made more egregious by repeated violation of a rule prohibiting dishonest conduct, as "[t]here is nothing more antithetical to the practice of law than dishonesty...." *In re Daniel,* 11 A.3d 291, 300 (D.C.2011). Such "continuing and pervasive indifference to the obligations of honesty in the judicial system and to the duty of loyalty" owed, demonstrate the type of behavior that justifies the ultimate sanction of disbarment, regardless of the attorney's motive or financial gain, even where such motivation appears to be altruistic. *Corizzi, supra,* 803 A.2d at 443 (noting that because the attorney's conduct was so egregious, "[w]hat his precise motives were or whether he benefitted financially is not determinative").

In this case, respondent misused public witness voucher funds in violation of 18 U.S.C. §§ 1001 and 1008, in addition to seven rules of professional conduct. Respondent then compounded his misuse of witness voucher funds by failing to make mandatory disclosures of voucher distribution to the court or to opposing counsel. We have held that such conduct justified disbarment for similar, and arguably less egregious, conduct.[20] *See Cleaver–Bascombe II, supra,* 986 A.2d at 1200; *Kanu, supra,* 5 A.3d at 14. As stated in the Jeffrey Report:

> [r]espondent's conduct evinces a long and calculated course of dishonesty: false certifications to federal agencies, intentional diversion of federal funds to individuals not entitled to receive them, deliberately withholding from criminal defendants exculpatory information to which they were constitutionally entitled, and false and misleading statements to courts that bore directly on the credibility and bias of key government witnesses.

Further, respondent repeated his dishonesty, with fraudulent distribution of witness vouchers to at least four different

---

**20.** In addition, many other jurisdictions look to the *ABA Standards for Imposing Lawyer Sanctions* ("*Standards*") when determining appropriate discipline for attorney misconduct. Arizona, Colorado, Louisiana and Indiana courts have disbarred prosecutors for similarly dishonest behavior, considering the nature of the attorney misconduct or "duty violated," under the purview of the *Standards. See In re Peasley,* 208 Ariz. 27, 90 P.3d 764, 769, 771 (2004) (en banc) (prosecutor disbarred for providing false testimony at trial); *People v. Brown,* 726 P.2d 638, 640–41 (Colo. 1986) (prosecutor disbarred for convictions involving dishonesty and abuse of public office). In *Brown, supra,* 726 P.2d at 639–41, the Colorado Supreme Court disbarred an elected District Attorney, whose convictions for forgery, abuse of public records and computer crime, arising out of his effort to reduce points on his driving record to get a more favorable automobile insurance rate, warranted the court's most severe sanction. The court highlighted that such an abuse of power was not only a violation of his oath as a prosecutor, but directly undermined the public's confidence in the office of the District Attorney, as a whole.

groups of individuals: (1) retired police officers serving as case agents; (2) members of the Jones family (issued by respondent even after he left the USAO); (3) friends and family of incarcerated government witnesses who had no knowledge of the crimes being investigated but were paid as much as $8,000 of public funds for maintaining witness resolve; and (4) prisoners.

Though respondent did not benefit financially from his use of vouchers, as an AUSA he diverted federal funds with which he was entrusted, for an unlawful purpose, justifying his actions based on "moral reasons." Even if respondent had laudable intentions, he was, nonetheless, intentionally dishonest in his fraudulent misuse of public funds such that his behavior cannot be distinguished from that of other dishonest conduct warranting disbarment. As the Bolze Report notes, respondent misused the voucher system as if it were "a resource to be used as he saw fit in order to accomplish the goal of convicting some very violent, homicidal drug dealers ... and [respondent] was willing to bend the rules to achieve results." (Internal quotation marks omitted.) Further, benefits need not be financial to be significant, as acknowledged in *Peasley, supra,* 90 P.3d at 774, where the Arizona Supreme Court disbarred a prosecutor who provided false testimony in capital murder trials. The court in *Peasley* noted that a prosecutor's desire to "win" and obtain convictions can be the basis of a selfish motive, justifying disbarment over other forms of sanction. *Id.* The court also highlighted the heightened ethical standards imposed on prosecutors, stating "[w]hen a Government lawyer, with enormous resources at his or her disposal, abuses this power and ignores ethical standards, he or she not only undermines the public trust, but inflicts damage beyond calculation to our system of justice," compelling disbar-

ment. *Id.* at 772–73 (quoting *In re Doe,* 801 F.Supp. 478, 480 (D.N.M.1992)).

As the Board noted, Respondent's "deliberate and repeated false sworn statements and certifications to the government that resulted in the misuse of public funds," eclipse the single instances of fraudulent voucher use and concealment which justified disbarment in one of our previous cases. *Cleaver–Bascombe II, supra,* 986 A.2d at 1199. Though the Bolze Report claims that respondent's behavior was less severe than the flagrant dishonesty and misappropriation of client funds warranting disbarment in *Cleaver–Bascombe II* and *In re Pelkey, supra,* 962 A.2d at 281, we disagree. In *Cleaver–Bascombe II,* we found a lawyer's intentional misapplication of public funds, by way of "a patently fraudulent voucher," to be as much an ethical offense as misappropriation, deserving disbarment. 986 A.2d at 1199. In *Pelkey,* the court found that the respondent's criminal conduct and dishonesty to courts and disciplinary bodies, was akin to the type of "continuing and pervasive" dishonesty that justified disbarment under our law. *Pelkey, supra,* 962 A.2d at 282. Respondent's conduct is as, if not more, egregious than Cleaver–Bascombe's fraudulent voucher use because respondent not only exhibited dishonesty on several occasions to issue improper vouchers, but actively concealed this continued misuse to both the trial court and opposing counsel, though he knew it was relevant to the issue of the credibility of key government witnesses. Further, respondent's repeated dishonesty is as severe, if not more so, than that observed in *Pelkey,* where an attorney was disbarred for alleged misappropriation of entrusted funds, his repeated and blatant dishonesty, and his lack of remorse. In this case, respondent's role as a prosecutor heightens the need for deterrence and the poten-

tial for harm to the public as a result of his misconduct. *See Pelkey, supra,* 962 A.2d at 281–82. We cannot ignore the broad-reaching repercussions of respondent's prosecutorial misconduct, "jeopardiz[ing] the convictions of multiple, notorious defendants, [resulting in significant reductions to their sentences] and caus[ing] OPR and the criminal justice system to spend extensive time and resources investigating his misconduct," as noted in Bar Counsel's brief.

■ As a prosecutor, respondent had a duty to act as "a minister of justice," and an obligation to "see that the defendant is accorded procedural justice."[21] Rule 3.8, Comment 1. Further, respondent's intentional misuse of witness vouchers even after he left his employment at the USAO, heightens his violation of this duty, "undermin[ing] the public's faith in both the legal profession and our system of criminal justice." *Corizzi, supra,* 803 A.2d at 443; *cf. Disciplinary Counsel v. Phillips,* 108 Ohio St.3d 331, 843 N.E.2d 775, 777 (2006) (prosecutor disbarred for accepting bribe and offering to "fix" criminal cases). In previous cases where we found disbarment to be an appropriate sanction, the misconduct, and the consequences of the attorney's misconduct were not nearly as broad-reaching as they are here. It does not follow that the egregious, repetitive dishonest conduct of a prosecutor, which jeopardizes the liberty rights of many and the safety of the public, should be less

stringently disciplined. Moreover, respondent's dishonest conduct comes in tandem with a series of additional violations which render his misconduct all the more deserving of greater sanction. *Corizzi, supra,* 803 A.2d at 443 ("these ethical violations do not each stand alone as a single incident .... but ... in conjunction with a series of additional serious violations."). Therefore, as to the nature of the offense, we hold that respondent's conduct, both his witness voucher misuse and his subsequent failure to disclose, constituted flagrant, repeated dishonesty warranting disbarment.

## B. Mitigating and Aggravating Circumstances

■ We next consider how mitigating or aggravating circumstances may alter the sanction appropriate for respondent's misconduct. *See Cleaver–Bascombe II, supra,* 986 A.2d at 1199. Respondent urges the court to adopt a one-year suspension, as recommended by two members of the Board, contending that the mitigating circumstances of his misconduct outweigh the aggravating circumstances. Respondent relies on several mitigating factors to justify a minimal suspension over disbarment: (1) his witness voucher use was an exercise of the "moral duty of every prosecutor to protect cooperating witnesses from being murdered[;]" (2) the "cloud" over his reputation during the considerable delay in this case harmed him;[22] (3) he has no prior or subsequent

---

21. The Jeffrey Report highlighted the powerful language applied in *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), to emphasize the importance of the role of AUSAs in our justice system:

The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution

is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law.... [W]hile he may strike hard blows, he [may not] strike foul ones.

22. Though this disciplinary case has been lengthy in duration, from the misconduct in 1995 to the disciplinary hearing in 2007, no such delay warrants mitigation of his sanction or demonstrates the prejudice upon which respondent relies in his argument for

record of misconduct; and (4) he has accepted responsibility for his misconduct and cooperated with Bar Counsel by entering a stipulation. Collectively, he argues, these factors warrant mitigation of the sanction for his misconduct. We disagree and address each mitigating factor in turn, and explain why, in our view, they are far outweighed by the aggravating factors in this case.

Even if respondent misused the federal witness vouchers with the laudable goal of witness safety in mind, as he contends, his conduct amounted to improper exploitation and diversion of government resources, which, instead of protecting his witnesses, undermined and usurped the court's ability to provide such protection.[23] *See Tinsley v. United States,* 868 A.2d 867, 874 (D.C. 2005) (per curiam) (noting that the court can limit exposure of public hearings to protect witnesses). By his own admission, respondent intentionally chose not to disclose the witness voucher use to the trial judge, stating that his concealment of voucher distribution was "a decision that

[he] took out of [the trial judge's] hands...." Further, as the Hearing Committee noted, witness safety concerns could not explain why respondent withheld information about vouchers and payments to Theresa Bryant–Greene, a government witness in *Card/Moore,* whose identity was known to the defense. As stated in the Jeffrey Report, "balancing [concerns about witness and informant safety] ... is quintessentially a judicial function, which [r]espondent usurped in order to avoid impartial scrutiny by [the trial judge]." Though respondent contends that he had laudable goals and was under a considerable amount of pressure in handling high-profile criminal cases, his concern for witness safety is not a mitigating factor in determining his sanction and instead highlights the aggravating factors of respondent's repeated use of dishonest means several times over the course of three significant prosecutions, and overall failure to recognize the severity of his misconduct. Moreover, any argument by respondent that

mitigation. Relying on *Ponds, supra,* 888 A.2d at 240–44, respondent argues that he has suffered extensive prejudice due to the considerable delay in the proceedings, as a result of both the stigma caused by the charges against him and from his suspension from the practice of law. *See In re Fowler,* 642 A.2d 1327, 1331 (D.C.1994) (holding that delay will warrant mitigation where it is "unique and compelling to justify lessening what would otherwise be necessary to protect the public interest"). However, respondent maintained employment in private practice from the time he left the USAO in 1995, until his suspension on September 30, 2010. As the Hearing Committee noted, but for the delay, respondent would not have been able to participate actively in a high-profile Enron-related litigation until he disclosed to his client his pending disciplinary charges in February 2007. Furthermore, as noted by the Board, the delay that respondent complains of allowed him to "amass the track record of good character on which he relies to mitigate the sanction and obviate the need

for a fitness requirement." Therefore, we do not consider the delay in proceedings as a mitigating factor for determination of respondent's sanction and find that respondent suffered no more embarrassment at the publication of charges than any other attorney facing disciplinary sanction.

23. Respondent stipulated that he knew that he should have disclosed evidence of his voucher use to both opposing counsel and the court. Further, in both the *Card/Moore* and *Newton Street Crew* cases, the government relied predominantly on testimony of cooperating, incarcerated witnesses who were involved in the criminal conduct with which the defendants were charged. Accordingly, the credibility of these witnesses was hotly contested throughout each trial. As noted in the Hearing Report, evidence of "[b]enefits provided directly or indirectly to cooperating government witnesses by the government could have been relevant to the jurors' duty to determine credibility and weigh bias."

such dishonesty was justified by concern for witness safety is countered by the harm caused by the significant reduction of several sentences for convicted felons.

In light of those reduced sentences, a further aggravating factor centers upon the magnitude of his misconduct and its foreseeable consequences, which overwhelm any absence of prior or subsequent disciplinary actions.[24] *See Goffe, supra,* 641 A.2d at 461. As in *Cleaver–Bascombe II,* respondent's insidious misuse of the voucher system and subsequent dishonesty caused foreseeable, serious injury to the judicial system and inhibited the administration of justice, resulting in several lengthy felony sentences of nine violent offenders being substantially reduced. *See Cleaver–Bascombe II, supra,* 986 A.2d at 1200 n. 11. As stated in the Jeffrey Report, "[a] government lawyer's intentional misapplication of substantial public funds entrusted to his control may be every bit as serious and harmful as misappropriation or theft from a private client." As observed by the Hearing Committee, respondent's false certifications used to misuse thousands of dollars in public funds would have been sufficient to justify disbarment, and where such misconduct is supplemented by subsequent dishonesty to courts and defense counsel in criminal felony trials, disbarment is surely warranted. Here, the gravity of respondent's fraudulent misconduct over a two-year period is an aggravating factor which outweighs the impact of mitigation and renders the lack of any past or subsequent disciplinary record irrelevant. *Cf. Cleaver–Bascombe II, supra,* 986 A.2d at 1200 (noting that absence of prior discipline was "massively outweighed by the aggravating factor—testifying falsely under oath in the disciplinary proceeding that the voucher was indeed accurate").

We additionally consider respondent's failure to accept responsibility as an aggravating factor in our determination of the appropriate sanction for his misconduct. Though appellant argues that his Stipulation "show[ed] his cooperation ... [and] contrition," any mitigating effect of such cooperation is significantly overwhelmed by his "partial and conflicted acceptance for his misconduct," as observed by the Hearing Committee, and shown repeatedly in respondent's continued representations throughout this case. Respondent dismisses his egregious misuse of government funds as nothing but "technical and insignificant violations," revealing a failure to accept responsibility for his actions that we have, in the past, considered as an important aggravating factor justifying disbarment. *Cf. Pelkey, supra,* 962 A.2d at 282 ("Pelkey's lack of remorse has been evident throughout the disciplinary proceeding and, despite the overwhelming evidence against him, he continues to resist acknowledging his wrongful and unethical conduct."). Respondent's disdain for fol-

---

24. Respondent was the subject of prior discipline in New Mexico in the matter of *In re Howes,* 123 N.M. 311, 940 P.2d 159 (1997), where he was publicly censured for his inappropriate contacts with a represented defendant. The New Mexico Supreme Court noted that respondent "indicate[d] a lack of appreciation for the importance of the duty at issue," finding no fault in his actions and exhibiting no remorse. Here, the Hearing Committee declined to consider the censure as an aggravating factor in consideration of the appropriate sanction for respondent's conduct. This determination by the Hearing Committee was bolstered not only by the twenty year difference between respondent's conduct in the New Mexico case and the current case, but also by the considerable "debate [at that time] concerning the federal government's power to preempt state ethics ... and federal prosecutors' ability to have contact with represented persons...." We, too, decline to consider the New Mexico censure as an aggravating factor, noting that respondent's conduct requires our most stringent sanction without incorporating this factor into our analysis.

lowing rules and reckless determination to resolve issues of witness safety by extrajudicial means and through abuse of his prosecutorial powers, even after his departure from the USAO, demonstrate an unapologetic disrespect for the justice system that far outweighs any mitigating factors and proves that he believes the law may be ignored where his compliance would inhibit ostensibly laudable goals.[25] Thus, we decline to credit respondent's cooperation as a mitigating factor to limit his discipline, noting that any cooperation was significantly outweighed by respondent's failure to recognize the gravity of his misconduct.

We further find respondent's misconduct aggravated by his status as a prosecutor. The determination of an appropriate disciplinary sanction has heightened significance in the context of a prosecutor's fitness to practice law, because the prosecutor's violation of ethical rules is compounded by his additional duty to the public.[26] The fair administration of justice relies, in large part, upon the integrity, honesty and trustworthiness of prosecutors, and where misconduct causes a prosecutor's ethics to be questioned, the entirety of the criminal justice system is called into question. Accordingly, a prosecutor who violates ethical rules and exploits his broad discretion and access to government resources to misuse public funds, both undermines the legal profession and calls into question the fairness of the criminal justice system within which he operates. As noted by respondent's supervisors and colleagues at the USAO and documented in the OPR Report, respondent exhibited a consistent, aggressive disdain for statutes, rules and procedures as a prosecutor, which resulted in his use of the voucher system as a discretionary fund to be distributed at his will. Respondent's steadfast determination to achieve convictions led him to circumvent federal laws and ethical rules, displaying "a continuing and pervasive indifference to the obligations of honesty in the judicial

---

**25.** In retreating from any acceptance of responsibility, respondent contends that the USAO did not provide training on vouchers and, that it was common practice to issue vouchers to non-testifying cooperators who provided information. However, the Hearing Committee and Board did not base their findings of misconduct on such behavior. In its report, the Hearing Committee noted that "[a]lthough we believe that this conduct was not in accord with the statute and regulations, we recognize that the practice of providing vouchers to non-testifying witnesses was within the norm for this office and had a colorable legal justification. It seems that in at least some respects, [r]espondent relied on standard office practice concerning witness payments to non-testifying cooperators, as did at least some of his colleagues."

**26.** Our reasoning is supported by the ABA *Standards,* which recommend consideration of the following factors, similar to those identified in *Cleaver–Bascombe II,* when determining sanctions: "1) the duty violated; 2) the lawyer's mental state; 3) the actual or potential injury caused by the misconduct; and 4) the existence of aggravating and mitigating factors." *Peasley, supra,* 90 P.3d at 769. The *Standards* state that "disbarment is generally appropriate when a lawyer in an official or governmental position knowingly misuses the position with the intent to obtain a significant benefit or advantage for himself or another." This reasoning is in line with our jurisdiction's interest in using discipline to protect the public and deter misconduct which undermines the legal system. Here, as demonstrated in the *Standards,* disbarment is an appropriate sanction where respondent, in a governmental position, intentionally used his access to exploit public resources and call into question the federal and state judicial processes in which he participated. The nature of respondent's misconduct warrants disbarment due to his role as a prosecutor, the repeated dishonest nature of his conduct, and the secretive nature of his offense, extending our past disciplinary determinations and in agreement with the reasoning of the persuasive logic of the *Standards.*

system." [27] *Pelkey, supra,* 962 A.2d at 281. The severity of this conduct is amplified when misconduct as subtle and undetectable as voucher distribution is actively concealed from both the courts and criminal defense counsel. Additionally, failure to sanction respondent with our most extreme sanction would endorse respondent's reasoning that honorable ends justify unlawful means, failing to deter others from adopting similar attitudes. Not only does this type of conduct impugn a prosecutor's moral fitness to practice law, but prosecutorial actions such as these can place another's liberty interests in the balance. The appropriate sanction should reflect this gravity.

In light of these considerations, we find particularly egregious respondent's disregard for rules and procedures governing the criminal justice system, the repercussions of his misconduct due to respondent's role as a prosecutor, respondent's reluctance to admit the severity of his misconduct, and the repetitive nature of respondent's dishonest conduct, all of which prevent us from finding the mitigating factors cited by respondent sufficient to limit his discipline. [28] Therefore, we conclude that the aggravating factors of respondent's misconduct vastly outweigh the mitigating factors, justifying a sanction of disbarment.

## C. Protection of the Public, Courts and Legal Profession

 Protection of the public, the courts, and the legal profession is a paramount concern to this court in determining the appropriate sanction for attorney misconduct. *Cleaver–Bascombe II, supra,* 986 A.2d at 1195. Where misconduct is particularly difficult to discover and involves direct exploitation of government resources, as with government voucher fraud, a greater penalty is warranted in the interest of both deterrence and protection of the public. *Id.* at 1199–1200 (noting that voucher fraud requires a particularly severe penalty because, "in the interest of effective general deterrence, the severity of a sanction should take into account the difficulty of detecting and proving the misconduct at issue") (citing *Cleaver–Bascombe I, supra,* 892 A.2d at 414 (Glickman, J., dissenting)). This concern was validated by the Hearing Committee's observation that respondent's intentionally evasive use of "federal vouchers with the caption of a different criminal case than the one being tried in the Superior Court [made it] more difficult for defense counsel to dis-

27. This is not to say that respondent's colleagues did not warn respondent about his misconduct with respect to his use of witness vouchers. In 1993, at least one of respondent's colleagues warned him that he could be punished for his improper voucher use. Further, based on respondent's frequent distribution of vouchers in extremely large amounts to two informants in the *Newton Street Crew* case from 1990 to 1992, the USAO began an internal investigation into respondent's voucher use; however, the investigation was not yet complete in 1995, when respondent left the USAO, and was never concluded.

28. This case is distinguishable from a recent case where mitigating factors warranted a less severe sanction than was recommended by Bar Counsel for a prosecutor's misconduct. *See In re Parshall,* 878 A.2d 1253 (D.C. 2005). In *Parshall,* a reciprocal discipline case, we suspended a prosecutor for eighteen months for intentionally misleading a federal court on at least one occasion. 878 A.2d at 1254. However, that sanction was a downward departure from the three year suspension recommended by Bar Counsel due to several mitigating factors (prosecutor expressed regret for misconduct, no prior disciplinary problems in twenty years of practice, cooperated fully with Bar Counsel, and participated voluntarily in pro bono programs) which are not present in the case before us. *Id.*

cover the extent of payments to cooperating government witnesses and their relatives, girlfriends and the like." Here, the witness voucher distribution system was not monitored to assure the compliance of voucher use, requiring more stringent discipline when misuse is observed and a heightened need for deterrence. *Cleaver–Bascombe II, supra,* 986 A.2d at 1199–1200.

 We are further motivated to hold prosecutors accountable in light of their pivotal role in the justice system, the great discretion they are given, and the few tools available to oversee their compliance with the legal standards that govern their conduct. *See Imbler v. Pachtman,* 424 U.S. 409, 423–24, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). An appropriate sanction is an effective means of both protecting the public and deterring future prosecutors from performing similarly egregious conduct. In *Imbler, supra,* 424 U.S. at 429, 96 S.Ct. 984 the Supreme Court held that disciplinary sanctions should be applied to deter prosecutorial misconduct that would otherwise go unpunished. *Id.* ("[A] prosecutor stands perhaps unique, among officials whose acts could deprive persons of constitutional rights, in his amenability to professional discipline by an association of his peers."). The Jeffrey Report embraced this reasoning and emphasized our responsibility to apply a sanction that effectively deters prosecutorial misconduct: "Prosecutorial misconduct is difficult to detect because critical prosecutorial functions

take place with little or no judicial supervision and with minimal scrutiny by superiors. Effective general deterrence thus weighs heavily in favor of [disbarment]." Our disciplinary system offers a unique opportunity to hold respondent accountable for disregarding his ethical responsibilities. In this case, respondent is neither civilly liable for his misconduct as a prosecutor nor punishable by the USAO, as he is no longer an employee. The protection of the public, courts and legal profession justifies disbarment for the necessary purpose of future deterrence of misconduct such as respondent's conduct in this case.

### D. Moral Fitness of Attorney

 Under the final factor of our analysis, respondent argues that his moral fitness justifies a lesser sanction, because he has no record of ethical violations in the fifteen years since his departure from the USAO.[29] Though respondent has had an unblemished record since the misconduct charged in this case occurred, this factor alone does not override the multiple serious violations charged in this matter. Here, respondent's:

> [A]bsence of prior discipline cannot excuse an offense against common honesty [that] should be clear even to the youngest [practitioner]; and ... neither cooperation with the disciplinary body (which is already required by the ethical rules) nor contrition is sufficient to put at risk the continued confidence of the public in integrity of the bar and the judiciary.

29. It is important to place respondent's claim of an unblemished record in context. Prior to events which serve as the basis of this case, respondent's misconduct in other criminal matters resulted in decisions being overturned or remanded. *See James v. United States,* 580 A.2d 636, 638 (D.C.1990) (remanded due to respondent's untimely *Brady* disclosure); *Henderson v. United States,* 632 A.2d 419 (D.C.1993) (reversed conviction due

to respondent's prosecutorial misconduct); *see also Dixon v. United States,* 565 A.2d 72, 81–82 (D.C.1989) (Mack, J., dissenting). Though these were not disciplinary matters, such grave consequences from respondent's misconduct failed to deter respondent from intentional misuse and concealment of witness vouchers in subsequent serious felony trials.

*Addams, supra,* 579 A.2d at 196 (internal quotation marks and citation omitted). Respondent's emphasis upon his lack of previous discipline is symptomatic of his larger failure to acknowledge the severity and impropriety of his misconduct. As in many other cases where we found disbarment appropriate, respondent fails to take responsibility for his repeated ethical violations, demonstrating that more temporary sanctions may not address his consistent disregard for federal laws and ethical rules. *Cf. In re Daniel, supra,* 11 A.3d at 300 (noting that "Daniel's lack of acknowledgment of misconduct also reflects on his moral fitness as an attorney, another factor we consider in determining the appropriate sanction"). In *Pelkey,* we disbarred an attorney for his lack of fitness to practice law, due to a "continuing and pervasive indifference to the obligations of honesty in the judicial system. . . ." *Pelkey, supra,* 962 A.2d at 282 (quoting *Corizzi, supra,* 803 A.2d at 443). Further, in *Goffe,* disbarment was appropriate in similar circumstances where we found that there was "no suggestion that respondent [understood] the impropriety of his conduct." *Goffe, supra,* 641 A.2d at 466. In the instant case, respondent justified his actions with a host of reasons, citing the complex nature of his prosecutions, the absence of a formal USAO training program on voucher distribution, and the fact that he cooperated by entering into a stipulation. These justifications, each of which we have addressed, make clear respondent's failure to take responsibility for his misconduct, his lack of remorse, indicating to this court that respondent is not fit to practice law, and must be disbarred.

Respondent's attempt to bolster claims of his good character, by way of affidavits and letters of several judges and former colleagues, are equally unsuccessful as demonstrations of his fitness to practice. Many of the letters and affidavits were written by those who did not know respondent until after the misconduct in question occurred, and who did not fully understand the nature of respondent's disciplinary proceedings. Further, the attestations of good character provided by respondent were off set by the views widely held by his fellow AUSA supervisors and colleagues, whose recorded observations in the OPR Report described him as a "cowboy" and willing to "stretch" the rules. A former defense attorney, who knew of respondent's reputation, testified in respondent's disciplinary proceeding and confirmed that respondent was known to be "untrustworthy" amongst the defense bar. Accordingly, we give little weight to respondent's claims of good character in our determination of the appropriate sanction.

## VI.

## SANCTION

Relying on the legal principles outlined above, we adopt the sanction of disbarment recommended by four of the members of the Board. Disbarment is clearly the appropriate sanction in this case. Respondent's intentional misuse of government vouchers, subsequent fraudulent acts used to conceal the misuse, his intentional failure to disclose the voucher payments to the courts and opposing counsel, and his extensive breach of public trust warrant disbarment in the present case. We have previously found disbarment appropriate in circumstances where a single instance of misapplication of public funds demonstrated that an attorney was no longer fit to practice law. *Cleaver–Bascombe II, supra,* 986 A.2d at 1199–1200. Further, disbarment has been the appropriate sanction where, despite repeated misconduct, an attorney remains unwilling to show contrition or responsibility for his actions. *Corizzi, supra,* 803 A.2d at 443. We need not

depart from our disciplinary precedent, where we have required disbarment in cases of misappropriation and flagrant dishonesty, simply because respondent did not gain a direct financial benefit from his misconduct. As an attorney, and specifically as a prosecutor, respondent had a "duty ... to be scrupulously honest *at all times,* for honesty is 'basic' to the practice of law." *Cleaver–Bascombe II, supra,* 986 A.2d at 1200. Even where the respondent's intent underlying the misappropriation and unlawful non-disclosure is arguably laudable, such flagrant violation of federal laws and ethical duties in the name of justice is more egregious than circumstances where one's objective is solely for personal gain.

Though we disagree with the recommendation of a lesser sanction, supported by five of the Board's members, the ultimate determination of discipline rests with this court and we conclude that the gravity of respondent's violations warrant disbarment. *Goffe, supra,* 641 A.2d at 464. We agree with the reasoning of the Jeffrey Report, taking particular note of the acknowledgment that "[i]t is dangerous to indulge the argument that prosecutorial fraud and dishonesty merit leniency when undertaken for the purpose of convicti[on]." Respondent's repeated dishonesty and disregard for both his ethical obligations as a prosecutor and the limitations of federal law resulted in substantial reductions of sentences for nine convicted felons, compromised the administration of justice, and jeopardized public confidence in the system of justice, which he was sworn and obligated to uphold. In the past, we have disbarred attorneys for their dishonest manipulation of funds which affected the interests of a single client; here, disbarment is the only appropriate sanction where respondent's disregard for the laws of our jurisdiction affected the liberty interests of many and the safety of our larger community. *See Corizzi, supra,* 803 A.2d at 440.

Accordingly, for the foregoing reasons, it is ORDERED that respondent G. Paul Howes is disbarred from the practice of law in the District of Columbia, effective *nunc pro tunc* to September 30, 2010.

*So ordered.*