**[J-88-2018] [MO: Saylor, C.J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| EDWARD J. SCHOCK, | : | No. 79 MAP 2017 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 40 CD |
| | : | 2017 dated August 4, 2017 Affirming |
| v. | : | the Order of the Lebanon County |
| | : | Court of Common Pleas, Civil Division, |
| | : | at No. 2016-00423 dated December |
| CITY OF LEBANON, | : | 19, 2016. |
| | : | |
| Appellee | : | ARGUED:  December 4, 2018 |

**CONCURRING OPINION**

**JUSTICE WECHT**                                              **DECIDED:  May 31, 2019**

Article 2, Section 1 of the Pennsylvania Constitution provides that "[t]he legislative power of this Commonwealth shall be vested in a General Assembly[.]"[1]  "Legislative power is the power 'to make, alter, and repeal laws.'"[2]  Embedded within the General Assembly's constitutionally vested lawmaking power is an implicit, concomitant responsibility to exercise that power in a way that produces intelligible legislation.

In accordance with the Statutory Construction Act,[3] this Court strives to "ascertain and effectuate the intention of the General Assembly."  *See* 1 Pa.C.S. § 1921(a).  In doing so, we are guided by the principle that the best indication of the General Assembly's intent is the plain language of its statutes.  *Allstate Life Ins. Co. v. Commonwealth*, 52 A.3d

---

[1]     PA. CONST. art. 2, § 1.

[2]     *In re Marshall*, 69 A.2d 619, 626 (Pa. 1949) (quoting *O'Neil v. Am. Fire Ins. Co.*, 30 A. 943, 944 (Pa. 1895)).

[3]     1 Pa.C.S. §§ 1901-1991.

1077, 1080 (Pa. 2012). When the words of a statute are clear and unambiguous, we do not look beyond its plain meaning "under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). When those words are not clear, we endeavor to construe the law's meaning by means of interpretive tools and presumptions that the General Assembly has codified. *See id.* §§ 1921(c)(1)-(8), 1922(1)-(5).

The dynamics of the relationship between the legislature's power of lawmaking and the judiciary's function of statutory interpretation underscore the importance of cohesive and thoughtful draftsmanship. Ambiguous and inconsistent statutes present interpretive difficulties and waste judicial and legislative resources, often at considerable taxpayer expense. Our tools of statutory construction—tools provided to us by the General Assembly—can prove virtually useless when we confront a statute afflicted by poor draftsmanship. Moreover, and of greater concern, courts run the risk of unwittingly subverting legislative intent when forced to interpret a highly ambiguous statute.

In the Neighborhood Improvement District Act, 73 P.S. §§ 831-840 ("the Act"), directly before us in this appeal, the General Assembly has failed in its duty to enact coherent legislation. Rather than providing municipalities with a comprehensive roadmap for the creation and administration of economic improvement districts, the lawmakers have prescribed a hopeless muddle of maddening contradictions. Specifically at issue here is the meaning of the term "affected property owner" in Subsection 835(f)(2), the veto provision of the Act, which provides:

> If 40% or more of the *affected property owners* within the proposed NID fail to register their disapproval of the final plan or amendment to the final plan in writing with the clerk of the governing body of the municipality in which the NID is proposed, the governing body of the municipality may, following the 45-day period, enact a municipal ordinance establishing an NID under this act or, in the case of an amendment to the final plan, adopt any amendments to the ordinance.

73 P.S. § 835(f)(2) (emphasis added).

The City of Lebanon maintains that the term "affected property owners" means *all* property owners, while Edward Schock contends that the term refers only to *assessed* property owners. In light of the statutory morass, I confess that both interpretations are plausible. After careful consideration, I join in the learned Majority's conclusion that the phrase "affected property owners," as used in the veto provision, means only assessed property owners. Further, I concur unreservedly in the Majority's suggestion that the "statutory scheme merits revisiting and adjustment by the policy-making branch." *See* Maj. Op. at 28. I write separately to emphasize this latter point.

Globally, the veto provision is part of a section of the Act entitled "Creation of neighborhood improvement district." *See* 73 P.S. § 835. To embark upon a virtual journey through the legislative instructions for creation of an NID, as prescribed by the General Assembly in the provisions of Section 835, is to confront the uncertainties that befall municipalities contemplating engagement in this process.[4]

First, subsection (a) provides that either the governing body of the municipality or, upon petition, residents or businesses within the municipality, may initiate action to establish an NID. *See id.* §§ 835(a)(1)-(3). Next, subsection (b) sets forth the specific procedures for initiating such action. Among these procedures is the requirement that a copy of the preliminary plan and the date, location, and time of any public hearing "shall be provided . . . to *all property owners* and lessees of property owners located in the proposed NID[,]" at least thirty days prior to the public hearing. *See id.* § 835(b)(1). The subsection immediately following this provision, however, states that the purpose of the public hearing is for "receiving public comment from *affected property owners* within the proposed NID[.]" *See id.* § 835(b)(2). The plain language thus requires that the

---

4    In the four textual paragraphs that follow, in order to highlight the inconsistency of the General Assembly's use of qualifying adjectives for the phrase "property owners," I will italicize relevant statutory language.

municipality provide *all* property owners with a copy of the preliminary plan and notice of the public hearing, but that only the comments of *affected* property owners are sought.

The preliminary plan, which *all* property owners must receive, shall include, among other things, a list of the properties to be assessed and the method for determining the amount of the assessment fee. *See id.* §§ 835(c)(2)(iii), (x). Additionally, the plan shall "[a]llow for and encourage *tax-exempt property owners* located within the NID to provide in-kind services or a financial contribution to the NID [Management Association], if not assessed, in lieu of a property assessment fee." *Id.* § 835(c)(3)(iii). Of particular relevance, the plan must also provide property owners with notice that "a negative vote of at least 40% of the *property owners* within the NID proposed in the final plan shall be required to defeat the establishment of the proposed NID[.]" *Id.* § 835(c)(3)(vii).

This brings us to the part of the process that involves the provision at issue in this appeal. Following the last public hearing, *affected property owners* have forty-five days to object to and disapprove the final plan. But if "40% or more of the *affected property owners* within the proposed NID fail to register their disapproval[,]" the municipality may enact an ordinance establishing the NID. *Id.* §§ 835(f)(1)-(2).[5] Importantly, affected property owners are required to object to the final plan pursuant to the requirements of Subsection 835(b)(3), which states, in relevant part: "Any objections by *property owners* within the proposed NID must be made in writing by persons representing the ownership of 40%, in numbers, of the *benefited properties* with the NID." *Id.* § 835(b)(3).[6]

---

[5] The double-negative in Subsection 835(f)(2) alone renders the veto provision inherently confusing, compounding the incoherence of the Act as a whole.

[6] The procedural veto provision, while beyond the scope of this appeal, is yet another example of inartful draftsmanship. This provision discusses the 40% threshold as a calculation of *properties*, whereas the substantive veto provision discusses the threshold in terms of *property owners*. By way of example, let us set aside the meaning of "affected," or the distinction between tax-exempt and assessed properties, and

After the establishment of an NID, the municipality may seek to amend its terms. Doing so requires "concurrence with 60% of the *property owners* within the NID." *Id.* § 835(g)(1). Before approving any changes, however, the municipality must hold at least one public hearing "to determine that such changes are in the public interest as it relates to *affected property owners* within the NID." *Id.* § 835(g)(2). Finally, any request for the termination of an NID may be submitted to the municipality, so long it has the approval of "40% of the *assessed property owners*, in numbers, located in the NID[.]" *Id.* § 838(b). This last clause is the only one in the entire Act that uses the term "assessed property owners."

Within the three subsections that directly reference the veto process, the General Assembly inexplicably uses three different phrases to characterize the properties or property owners involved: "benefited properties," "property owners within the NID," and "affected property owners." *See id.* § 835(b)(3), (c)(3)(vii), and (f)(2), respectively. As the Majority recognizes, it is "readily discernable [*sic*] that each of these terms cannot carry a distinct meaning." Maj. Op. at 17. The conundrum becomes even more perplexing when we read these provisions within the context of the entire Act. Throughout the Act, the General Assembly employs a potpourri of different phrasings: designated property

---

consider a district with 100 properties within a proposed NID. Imagine that one individual owned 50 of those properties, and the remaining 50 were owned by 50 separate individuals. Thus, there would be 100 properties, but only 51 property owners.

Under the substantive veto provision, which states that objections by "40% or more of the affected property owners" are required to defeat the NID's creation, at least 21 owners must object. *See* 73 P.S. § 835(f)(2). However, under the procedural veto provision, which states that objections must be made in writing by "persons representing the ownership of 40%, in numbers, of the benefited properties," the one individual owning 50 properties alone could defeat the NID's creation. *See id.* § 835(b)(3). Of course, these provisions could be read *in pari materia* in order to force consistency within the Act and avoid illogical results. But a more careful and studied approach to drafting by the General Assembly could achieve the same result without requiring judicial contortions of the Act's language.

owners, all property owners, affected property owners, benefited property owners, property owners within the proposed NID, assessed property owners, and tax-exempt property owners.

The General Assembly's language choices force interpretive decisions upon us. We must pick and choose among and between principles of statutory construction as we search for legislative intent. To apply one canon of construction invalidates our ability to rely upon another because to do so would yield a contradictory result. Thus the question becomes—upon which canon do we rely? Upon which do we place controlling weight?

For example, on the one hand, "it is not for the courts to add, by interpretation, to a statute, a requirement which the legislature did not see fit to include. Consequently, [a]s a matter of statutory interpretation, although one is admonished to listen attentively to what a statute says; one must also listen attentively to what it does not say." *Commonwealth v. Johnson*, 26 A.3d 1078, 1090 (Pa. 2011) (internal quotations and citations omitted). The Act does not expressly exclude tax-exempt property owners from participating in the process of creating an NID. To the contrary, certain provisions implicitly suggest that the General Assembly intended to include those property owners. All property owners, including tax-exempt property owners, must receive the preliminary plan and are invited to attend a public hearing and provide comment. *See* 73 P.S. § 835(b)(1). Additionally, the Act encourages tax-exempt property owners to provide monetary contributions or in-kind services in lieu of assessment fees, thereby implying that tax-exempt property owners have a stake in the NID's implementation. *See id.* § 835(c)(3)(iii). Curiously, the term "assessed property owners" is absent from all relevant provisions of Section 835 regarding the creation and veto processes and, in fact, appears only once in the Act. Thus, if this Court interprets the veto provision as limiting involvement only to assessed property owners, we arguably add a requirement "which

the legislature did not see fit to include," and, in so doing, contravene this rule of statutory construction.

However, on the other hand, "[i]n construing a statute, the courts must attempt to give meaning to every word in a statute, as we cannot assume that the legislature intended any words to be mere surplusage." *City of Phila. Fire Dep't v. W.C.A.B. (Sladek)*, 195 A.3d 197, 207 (Pa. 2018) (internal citation omitted). The veto provision applies to "affected property owners." To conclude that tax-exempt property owners are "affected" would be to read the word "affected" out of the provision, effectively reducing its meaning to "all." And, again, we would be contravening a rule of statutory construction.

Adhering strictly to yet another rule would require a conclusion that "affected" means neither "all" nor "assessed." Under the principle *expressio unius est exclusio alterius*, if the General Assembly includes specific language in one section of a statute but excludes it from another section, that language should not be implied where excluded. *See Atcovitz v. Gulph Mills Tennis Club, Inc.*, 812 A.2d 1218, 1223 (Pa. 2002). Here, the General Assembly used the phrases "all property owners" and "assessed property owners" in different provisions of the Act, demonstrating its ability to choose between those phrases where it intended. Therefore, applying the *expressio* principle, because the General Assembly chose not to qualify "property owners" in the veto provision with either "all" or "assessed," we cannot necessarily imply the meaning of the other. Around and around we go. The process is confounding.

Balancing the competing principles, and reading the Act in its entirety, as we must, the Majority concludes that, on balance, the veto provision is intended to apply only to assessed property owners. *See Trust Under Agreement of Taylor*, 164 A.3d 1147, 1155 (Pa. 2017) ("When construing one section of a statute, courts must read that section not by itself, but with reference to, and in light of, the other sections."). I find the Majority's

reasoning persuasive, especially given the overwhelming ambiguity created by the General Assembly. However, I observe that, in light of the fact that certain principles of statutory construction weigh in favor of the opposite (or perhaps some entirely different) interpretation, it would not be beyond this Court's authority to reach a contrary conclusion. I acknowledge this reality frankly, in the hope that our General Assembly will engage in careful draftsmanship when it discharges its constitutionally vested legislative power. Not least among the costs of its failure to do so is the risk that courts will undermine the General Assembly's true intentions notwithstanding faithful and diligent application of the rules of statutory construction.